NATHAN G. JOHNSON (OH State Bar No.0082838)
Ohio Environmental Council
1145 Chesapeake Avenue, Suite I
Columbus, OH 43212
Tel: 614-487-5841
njohnson@theoec.org

*Counsel for Plaintiff OEC*

# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| **OHIO ENVIRONMENTAL COUNCIL**, | Case No. 2:21-cv-4380 |
| Plaintiff, | Chief Judge Algenon L. Marbley |
| | Magistrate Judge Kimberly A. Jolson |
| vs. | |
| **U.S. FOREST SERVICE**, et al. | **PLAINTIFFS' OPPOSITION TO FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** |
| Defendants. | |
| | **ORAL ARGUMENT REQUESTED** |

## ARGUMENT

The resource conflicts entailed by the Sunny Oaks project and Defendants' dual priority of "accelerated early successional forest habitat" and "oak-dominated forest management" (AR 5627-28) are substantial. Yet Defendants never disclosed many of these conflicts to the public (the loss of ecto-mycorrhizal soils and networks, the loss of white oak, the loss of Indiana bat roosting habitat) in their NEPA process. AR 19329-32 (FONSI Statement). Nor did Defendants take the required hard look at these conflicts in their analysis process.

Nor did Defendants ever develop or disclose a well-reasoned or reliable methodology for implementing the project's oak regeneration silviculture. Defendants' oak silviculture "approach" is based on substantially incomplete data that SILVAH, the system Defendants have chosen to materially rely on, says will generate unreliable results. *Native Ecosystems Council v. Tidwell*, 599 F.3d 926, 934-35 (9th Cir. 2010) (finding NFMA and NEPA violations where agency's methodology relied on missing data and ran counter to guidance agency relied on). Defendants never provided any justification whatsoever why more definitive SILVAH plot data could not be provided. And Defendants did not even respond to this key issue in their opening brief. *Anglers of the Au Sable v. U.S. Forest Serv.*, 565 F. Supp. 2d 812, 829 (E.D. Mich. 2008).

Furthermore, the substantive portion of Defendants' oak silviculture approach consists largely of agency-side draft notes containing internal inconsistencies and unanswered questions. A court's role in the NEPA context is not to choose among legitimate competing methodologies, but to ensure that the methodology chosen satisfies the informational quality requirements of NEPA. *350 Mont. v. Haaland*, 29 F.4th 1158, 1176 (9th Cir. 2022) (declining to choose a specific methodology for the agency, but holding NEPA required agency to use *some* methodology that would provide "high quality" information and "[a]ccurate scientific analysis.") (quoting 40 C.F.R. § 1500.1). NEPA demands better informational quality from Defendants.

On the public-facing side, Defendants' "adaptive approach" to oak silviculture makes promises and appeals to authority, but comes up short on substantive detail. AR 19130 (comment bubble regarding keeping the approach "open ended"); AR 19321-23 (open ended approach in DN-FONSI). Perfunctory recitations of commitments to adaptive management renders a FONSI arbitrary and capricious. *Nat. Res. Def. Council, Inc. v. U.S. Army Corps of Eng'rs*, 457 F. Supp.

2d 198, 233-34 (S.D.N.Y. 2006); *Neighbors of Cuddy Mt. v. United States Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir. 1998).

Oak regeneration efforts, generally, are fraught with known complicating factors inherent to oak reproduction and development. *E.g.* AR 14795 (bottom third of page). The Sunny Oaks project injects these inherent uncertainties with a high degree of controversy. This is compounded by the fact that the Sunny Oaks project is by far the largest timber, prescribed fire, and herbicide project authorized by the Wayne National Forest in memory. Not by coincidence, the project coincides with a steep and sudden rise in the Wayne's assigned timber targets – targets several times larger than those assigned to the Forest in more than twenty years. AR 6045.[1]

Moreover, the Sunny Oaks project unlawfully deviates from the Wayne National Forest's Indiana Bat Habitat Retention Standard and the Forest's Two-Aged Harvest Retention Guideline. Lawful adherence to these mandates likely would have required the Wayne to consider and select a project alternative remarkably similar to one of the alternatives Plaintiff advanced throughout the NEPA process, but which Defendants declined to meaningfully consider: the retention of substantial amounts of white oak in two-aged stands. Instead, Defendants arbitrarily and capriciously determined that white oak trees do not exist in nature, and that Defendants were therefore no longer obligated to protect these trees under the Plan's mandatory Standard.

The Sunny Oaks project is unlawful. And all of the above factors render Defendants' Finding of No Significant Impact (FONSI) arbitrary and capricious.

---

[1] Spreadsheet tab "Alt2 Alt2B Comparison" shows Sunny Oaks Alternative 2b generating 32,855 CCF of timber volume for FY20 through FY23 in comparison to the Wayne's total projected cumulative target of 111,400 CCF for the same time period ("Summary (CCF)" table at upper right of tab). For comparison, the Wayne's FY2018 volume target was 14,607 CCF, which itself was nearly four times greater than the Forest's preceding 21-year average of annual timber targets (FYs 1997- 2017); *see also* AR 6045 ("Economic Summary" tab at line 82, Columns H and J, showing Updated Alternative 2's Estimated Total Stumpage Value as $443,276.21 and Estimated Complete Road Costs as $2,149,001.97) (agency-side); Cf. AR 13499-13500 (public-facing).

I.      **PLAINTIFF FULLY EXHAUSTED ITS CLAIMS.**

Plaintiff's administrative objection gave defendants ample notice of the mycorrhizal issues now before this Court. Plaintiff exhausted the administrative process. Defendants had their chance to develop the administrative record and respond to Plaintiff's concerns. They simply chose not to.

Forest Service regulations at 36 C.F.R. § 218.8(d) delineate the minimum information that must be contained in an objection. As detailed more fully below, the OEC's objection amply satisfied the minimum requirements of § 218.8(d). The OEC's objection explicitly identified mycorrhizal networks and their relevance to the project's forest health and oak ecosystem objectives as "specific issues related to the proposed project." 36 C.F.R. § 218.8(d)(5). The OEC's objection included "how the objector believes the environmental analysis or draft decision specifically violates the law, regulation, or policy" by noting that the agency's failure to consider mycorrhizal issues violated NEPA's "hard look" and reasonable range of alternatives requirements. The OEC's objection included "suggested remedies that would resolve the objection," by requesting that the Forest Service prepare an EIS that would address the indicated NEPA violations and that would consider a reasonable range of alternatives, "including an alternative that maximizes the potential of the Project Area's oak ecosystems." AR 13833-34. And, the OEC's objection included statements that demonstrated the connection of its prior specific written comments on fungal networks to the content of its objection, which satisfied the requirement of 36 C.F.R. § 218.8(d)(6).

The *entirety* of Defendants' consideration of fungal networks and soils in the administrative record consists of two perfunctory and *contradictory* responses to the OEC and the Sierra Club in Defendants' response to comments on the EA. Defendants mischaracterized

4

the OEC's comments (as strictly old growth and carbon issues), to avoid confronting the highly relevant soils (and thereby oak ecosystem and forest health) effects the OEC was raising. AR 13681 (RTC 14-10). Simultaneously, Defendants acknowledged that fungal networks are a larger soils issue in its response to the Sierra Club, but dismissed them on the grounds that the commenter had not identified relevant effects, significant or otherwise. AR 13693 (RTC 22-17.)[2]

When the OEC raised its concerns about fungal networks and soils in the objection process, Defendants again ignored them. Forest Service made no mention whatsoever of fungal networks or fungal soils in its response to the OEC's objection or in the DN-FONSI. AR 16114-28 (objection response); AR 13462-82 (DN-FONSI). Now, before this Court, Defendants continue their pattern of evading this key issue by falsely claiming that Plaintiff never raised it during the objection process. ECF 24 PageID 1910, 1912. It is Defendants that seek to fully reimagine the contents of Plaintiff's NEPA comments and its objection to the project. Plaintiff substantiated its concerns on this issue with numerous citations to peer-reviewed scientific literature – in the February 14, 2019 comments it *resubmitted and included* with its objection in accordance with 36 C.F.R. § 218.8(b). AR 14790; AR 14820-28.

Defendants repeat the falsehood that "those comments only alleged a connection between mycorrhizal networks and carbon sequestration (climate change) and old growth forests." Defendants resort to cherry-picking the OEC's comments (which, again, *were included as part of its objection*) in an effort to avoid admitting that they failed to evaluate relevant factors in this

---

[2] Defendants' perfunctory recitation of BMPs in the response to Sierra Club's comments is in no way a hard look at the subject. The record is devoid of any evidence that Defendants meaningfully considered impacts to mycorrhizal soils and networks and resulting impacts to forest health and sustaining oak on the landscape. *See Neighbors of Cuddy Mountain v. U.S. Forest Service*, 137 F.3d 1372, 1380 (9th Cir. 1998) ("perfunctory description of mitigation measures" inconsistent with NEPA's hard look requirement); *Blue Mts. Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1211-12 (9th Cir. 1998) (EA failed to show that soil BMPs were appropriate where it failed to analyze the specific soil concerns at issue). Defendants' response to Sierra Club's comments also stated that soil effects from compaction often recover within 20 years, but this finding ignores facts the agency had before it. Specifically, that the recovery of ectomycorrhizal soils may take 90 years or more. AR 14828.

5

matter. The OEC's comments did indeed touch on carbon, old growth, and old trees as regards fungal networks. But, more to the point, those comments also emphasized the fundamental importance of fungal networks for forest health and for the regeneration success of oak seedlings, *irrespective of carbon and old growth*.[3] *E.g.*, AR 14821 (stating that "*[e]cosystem resilience* in the face of climate change is an important factor that should receive consideration in this project" and that large clearcuts negatively impact "the regeneration success of young oak seedlings") (emphasis added); AR 14827 (noting plant responses to mycorrhizal networks include "foliar defense chemistry and defense response to pest pressure"; noting fungal diversity can facilitate "resistance to disease and drought"); *Id.* (noting robust fungal networks are "important for seedling establishment and growth").

The OEC comments emphasized major red flags about the potential adverse effects of the *Sunny Oaks* project on the *oak ecosystems* it targets *for the very reasons* the project targets them (regeneration and maintenance on the landscape). AR 14827 (alerting Defendants to the fact that there are competing types of fungal networks and soils – ectomycorrhizal and arbuscular; that these networks respectively serve competing forest types – oak-hickory versus maple-tulip; and that "the removal of mature [ectomycorrhizal] trees and the corresponding disruption of [ectomycorrhizal] networks may facilitate [arbuscular] invasion and succession from oak-hickory to maple-tulip ecosystems."); *Id.* (noting ectomycorrhizal fungi are especially sensitive to harvesting whereas arbuscular fungi increase after harvest); AR 14827-28 (noting that "[s]oil compaction from harvesting profoundly affects [ectomycorrhizal] fungi abundance, structure,

---

[3] The OEC comments of February 14, 2019 also cited and restated meta-analysis findings that, after heavy harvesting, it generally takes 90 years for ectomycorrhizal species richness to approach that found in undisturbed old growth forests. AR 14828. It would not have been lost on Defendants that the oak ecosystems targeted by the Sunny Oaks project are largely in this general age range. AR 6064; AR 13487 (Guideline departure rationale stating project developed to avoid harvesting stands below 60 years of age). Defendants were on notice that many of the project's stands could be expected to contain ectomycorrhizal species richness comparable to that found in old growth forests.

6

and function [and] therefore raises concerns regarding forest productivity, juvenile tree regeneration and long-term ecosystem functioning").

Defendants further mischaracterize the OEC's objection by claiming that "Plaintiff's objection to the Project referenced fungal networks only as part of its attempt to offer reasons why it believed its proposed alternative was superior to that selected for the Project." ECF 24 at DocID 1911. But the OEC's objection stated that the EA failed to consider a *reasonable range of alternatives* AR 13830 – 13833.

Defendants' opening brief conveniently fails to mention that, as part of its February 14, 2019 comment package on the EA, the OEC submitted a ten-page, pin-cited annotated bibliography of the mycorrhizal studies it cited in its comment letter, along with the 337 pages of the studies themselves. AR 11137-47; AR 11148-11485. The OEC did not resubmit this 347-page package on objection. Because it did not need to. The February 14 comment letter it included with its objection cited and discussed these studies and their direct relevance to the project in detail. AR 14790; 14820-28. If Forest Service wanted to take the extra step of delving even further into the issues Plaintiff raised and discussed on objection, nothing prevented it from examining the studies themselves and the pin-cited annotated bibliography Plaintiff prepared, all of which were part of the project file.[4]

The very first and only time throughout the entirety of the Sunny Oaks NEPA, objection, and now litigation process that Defendants have referred explicitly to any mycorrhizal study cited by Plaintiff occurs in Defendants' opening brief at ECF PageID 1913, fn. 5. Defendants cite

---

[4] Defendants knew that copies of the scientific literature cited by Plaintiff were contained in the Sunny Oaks project file independent of reminders from the OEC. Even so, Plaintiff's February 14 comment (which, again, Plaintiff resubmitted with its objection) stated that "[t]he literature cited herein will be submitted under separate cover." AR 14820. This statement gave Defendants additional notice during the objection process that these studies were contained in the project file and readily available for review. *See, also*, 36 C.F.R. 218.25(b)(2): "All written comments received by the responsible official shall be placed in the project file and shall become a matter of public record."

and mischaracterize (Wilhelm, et al. (2017)) by claiming that it "states that fungal networks did not appear to be affected by harvesting." But Defendants' citation to the literature is incorrect and only reinforces Plaintiff's point that heavy harvesting causes significant impacts to the *specific* types of fungal networks and fungal soils that *oak ecosystems* rely on, while benefitting the fungal soils of competing ecosystems. *See, e.g.*, AR 11498 ("[ectomycorrhizal] fungi['s] […] overall decline was a major interecozone effect of harvesting. In contrast, arbuscular mycorrhiza populations increased in harvested plots likely due to their common symbioses with successional plant cover").

Defendants cite to a handful of cases in support of their exhaustion argument. But all of these cases are readily distinguishable. *DOT v. Public Citizen*, 541 U.S. 752, 765 (2004) is widely cited for the fact that, "the agency bears the primary responsibility to ensure that it complies with NEPA, […] and an EA's or an EIS' flaws might be so obvious that there is no need for a commentator to point them out specifically in order to preserve its ability to challenge a proposed action." The respondents in Public Citizen waived their NEPA alternatives claims only because they failed to ask for any consideration of alternatives whatsoever in the public comment process. *Id*.

Defendants cite *Forest Guardians v. U.S. Forest Serv.*, 641 F.3d 423 (10th Cir. 2011) (failure to exhaust where claim not raised at all during the administrative process or even at the district court level). Plaintiff cites the same case here (though it has no need to) for the rule that "[c]laims not properly raised before an agency are waived, unless the problems underlying the claim are 'obvious' or otherwise brought to the agency's attention." *Id.* at 430. As discussed *supra*, Defendants demonstrated independent knowledge of the mycorrhizal soil issues in their response to the Sierra Club's comments. And the ectomycorrhizal (oak ecosystem) resource

8

conflicts entailed by this project would be obvious to anyone who actually reads Plaintiff's objection and included letter.

Defendants also cite *Native Ecosystems Council v. Kimbell*, No. CV 04-127-M-DWM, 2006 U.S. Dist. LEXIS 116659, *28-29 (D. Mont. Aug. 29, 2006) (species issues waived where plaintiff apparently failed to raise them in administrative appeal or its motions, and was unprepared to address them in oral argument), which is readily distinguishable on its facts. Lastly, Defendants cite *Native Ecosystems Council v. Lannom*, No. CV 21-22-M-DWM, 2022 U.S. Dist. LEXIS 62442 (D. Mont. Apr. 4, 2022). Again, this case is easily distinguishable. The *Lannom* court ruled on several exhaustion claims. Among them, one claim was not as well-developed in objection as in the litigation, but the court found the claim was adequate to put the agency on notice – but that plaintiff failed to plead the claim in its complaint. *Id.* at *9-11. Yet another claim was not exhausted because it was not pled in the complaint. *Id*. at *14-16. Another claim was not exhausted because plaintiff's motion argued precisely the opposite point it advanced in objection. *Id*. at *12. However, one claim *was* exhausted where monitoring trends were not made available to the public during comment and the plaintiff had questioned the Forest Service about monitoring trends during the administrative process. *Id*. at *12-14.

This is not a close question. Plaintiff fully complied with the applicable Forest Service objection regulations. Defendants cite no authority to the contrary. The OEC's objection, including the enclosed February 14, 2019 letter, provided Defendants with ample notice that mycorrhizal networks and soils were an important factor that were directly and highly relevant to at least two of the Project's four stated objectives. And, that the project threatened substantial negative impacts to fungal soils and thereby to the health, regeneration, and maintenance of oak

9

ecosystems. That Defendants chose to ignore these clear warnings about the Project's effects is no fault but their own.

## II. DEFENDANTS VIOLATED NEPA, THE FOREST PLAN, AND NFMA.

### A. Defendants Failed to Consider a Reasonable Range of Project Alternatives.

The likely substantial and permanent loss of white oak in the Sunny Oaks project's cutting areas is a major resource conflict entailed by the project.[5] The statutory text of NEPA at 42 U.S.C. § 4332(2)(E) requires federal agencies to consider alternatives to recommended actions whenever those actions "involve[] unresolved conflicts concerning alternative uses of available resources." AR 13830. Defendants' hard look failure extends to their refusal to meaningfully consider project alternatives that would retain substantial white oak in the Project's cutting areas, whether as a single species or as part of a broader oak-retention strategy generally. *See Meister v. United States Dep't of Agric.*, 623 F.3d 363, 377 (6th Cir. 2010).

Notably, Defendants acknowledged the threatened loss of white oak as a resource conflict in their response to comments on the EA. AR 13678 (stating "researchers and silviculturists have not identified prescriptions that can consistently regenerate stands that are dominated by white oak, while also creating young, brushy forest."). But Defendants did not even attempt to meaningfully analyze or address this conflict. Instead, Defendants attempted to side-step meaningful engagement with the issue by, *inter alia*, stating that "the exclusive management for white oak (or any other single species) was not the intention of the Sunny Oaks Project, nor is it desired." *Id*. Defendants argue the same in their motion for summary judgment, stating that the

---

[5] To further underscore this point, a current limitation of the SILVAH system is that it does not account for oak seedlings and saplings on a species basis. In other words, when used appropriately SILVAH can provide its users with reliable oak seedling and sapling data (number, size, distribution) on a genus level ("oak"), but it will not tell a user how much *white oak* reproduction is in a project's understory. *See* AR 6072; AR 14831; *Cf.* AR 13654 (Forest Service responding to OEC comments: "[r]emoving mature white oak can permanently eliminate or reduce its spatial footprint in a given stand points to the importance of having advanced regen present prior to overstory removal").

Forest Service "does not manage the land simply to cultivate one type of tree (*i.e.*, white oak or any other single species)." ECF 24 at DocID 1919. But these statements miss the point and mischaracterize the issue. The point is that white oak loss is a substantial resource conflict that should receive a NEPA "hard look." The issue is not whether or not the Project should manage *only* for a single species. Nor did Plaintiff ever request that the Project manage the forest *only* for white oak.

Throughout the life of the Project, Plaintiff requested that Defendants develop alternatives that would analyze retaining all white oak (and cutting everything else), analyze retaining all oak (and cutting everything else), or that would analyze retaining substantial amounts of oak, generally. Had Plaintiff requested that Defendants manage *solely* for white oak, it would have suggested an alternative that limited harvests to small cuts of approximately $1/20^{th}$ of an acre, which is *far less* harvesting than what Plaintiff *actually* requested be analyzed. *See* AR 14831. Defendants' mischaracterization of Plaintiff's call for a white oak retention alternative (or something similar), and its use of that mischaracterization as a rationale for dismissing the suggested alternative(s) is plainly arbitrary and capricious. "An agency cannot reject a proposed alternative by treating it as something it is not." *Meister v. United States Dep't of Agric.*, 623 F.3d 363, 378 (6th Cir. 2010).

**B. Standard Nullification, Guideline Creation, and the Disappearing Tree**

The Sunny Oaks project deviates from the Wayne National Forest's mandatory Forest Plan Standard SFW-TES-12.[6] This Standard, intended to protect roosting habitat for the

---

[6] Defendants argue that Plaintiff's opening brief did not preserve its NFMA claim relating to the Wayne National Forest's bat tree retention Standard. ECF 24 at DocID 1929, fn 9. Plaintiff's opening brief raised and argued this NFMA violation. *E.g.* ECF 18 at DocID 314 ("Forest Service's approval of the Sunny Oaks timber project in the Wayne National Forest violated […] the National Forest Management Act"); *Id*. at DocID 323 (Forest Service "violated mandatory terms of the applicable Forest Plan, as well as federal law and regulation."); *Id*. at DocID 334 ("All site-specific decisions must be consistent with the broader Forest Plan. […] Project-level departures from

federally-endangered Indiana bat, requires the Forest Service to retain a minimum of 12 lives trees per acre with large areas of loose bark in all hardwood cutting units:

> **SFW-TES-12:** With all hardwood timber harvests, retain a minimum of 12 live trees per acre (averaged over the cutting unit) of any species that are six inches or more dbh with large areas of loose bark, unless they pose a safety hazard.

AR 19442. In documentation not disclosed as part of the public-facing NEPA process, Defendants arbitrarily and capriciously determined that loose-barked trees do not exist in nature; and, that SFW-TES-12's loose-barked retention mandate was therefore nullified. AR 5607; AR 5617. Defendants' Forest Plan Standard "nullification" theory is wholly without basis in law. Defendants' refusal to implement SFW-TES-12's loose-barked tree retention mandate is a flagrant violation of NFMA and the Wayne's Forest Plan. 16 U.S.C. § 1604(i) ("resource plans, permits, contracts, and other instruments for the use and occupancy of National Forest System lands shall be consistent with the land management plans."); *Native Ecosystems Council v. United States Forest Serv.*, 418 F.3d 953, 961 (9th Cir. 2005) ("It is well-settled that the Forest Service's failure to comply with the provisions of a Forest Plan is a violation of NFMA.") (citations omitted).[7]

Defendants also failed to disclose their new "approach" to SFW-TES-12 to the public. The SFW-TES-12 letter and associated rationales Defendants sent to U.S. Fish and Wildlife Service were not disclosed in the EA or the DN-FONSI. *See* AR 13476. Notably, Defendants

---

Forest Plan Standards require a Forest Plan Amendment."); *Id.* at DocID 350 ("Wishing away the Plan's bat tree retention Standard violates the Wayne's 2006 Forest Plan, as well as NFMA 16 U.S.C. § 1604(i)."); *Id.* at DocID 352 ("As detailed above, the ill-conceived Sunny Oaks Project violates NEPA and NFMA."). Notably, Defendants cite no authority in support of their waiver argument. Nor have Defendants alleged any prejudice or unfair surprise. Nor could they. Plaintiff pled this NFMA claim in its complaint. ECF 22 at DocID 437. Furthermore, Defendants chose to respond to Plaintiff's NFMA claim in their opening brief. ECF 24 at DocID at 1929. Defendants will have ample opportunity to further address the merits in their reply briefing.

[7] In addition to NFMA's clear mandate that Forest Service projects must be consistent with governing Forest Plans, the Wayne's Forest Plan requires adherence to Standards and Guidelines by its own terms. AR 19417; AR 19421; AR 19423; *see also* AR 9671. Defendants violated these Forest Plan requirements.

issued a minor correction to their Biological Assessment and Biological Evaluation for the Project on January 10, 2020, which the DN-FONSI reflected, but the corrected BA/BE did not indicate or discuss any changes to SFW-TES-12 or Defendants' new "approach" to the same. AR 5291-92. In fact, the corrected BA/BE contained the statement that SFW-TES-12 (and GFW-VEG-11, *infra*) would be incorporated in the action for the protection of the Indiana bat. AR 5313. Documentation in the administrative record also shows that Defendants determined that reinitiation of formal consultation with U.S. Fish and Wildlife Service was not required under federal regulation for their new "approach" to SFW-TES-12. AR 19392-93; AR 19399-400. Despite the fact that USFWS's 2018 concurrence letter specified that reinitiation of formal consultation was required where "the continued implementation of the Revised Wayne National Forest Land and Resource Management Plan and projects predicated upon it is subsequently modified in a manner that causes an effect to federally listed species not considered in this opinion." AR 18962. The applicable Biological Opinion also provides that, "<u>It is important to emphasize that this effects analysis is predicated on the fact that all S&G in the Conservation Plan will be fully implemented. If not, this analysis may no longer be valid.</u>" AR20553 (emphasis in original).

Throughout the record on this matter, Defendants contended, *inter alia*, that roost tree availability is not a limiting factor for Indiana bats. *E.g.*, AR 5615. But whether or not that is the case is wholly irrelevant to the Court's inquiry in this matter. As the Ninth Circuit has stated:

> Our scope of review does not include attempting to discern which, if any, of a validly-enacted Forest Plan's requirements the agency thinks are relevant or meaningful. If the Forest Service thinks any provision of the [Forest] Plan is no longer relevant, the agency should propose amendments to the [Forest] Plan altering its standards, in a process complying with NEPA and NFMA, rather than discount its importance in environmental compliance documents.

*Native Ecosystems Council*, 418 F.3d at 961 (finding Forest Service's description of elk habitat retention standard as "not very meaningful" an invalid argument).

Defendants built their unlawful deviation from SFW-TES-12 on two factors: (1) their arbitrary and capricious determination that loose-barked trees (white oaks, in particular) do not exist in nature, and (2) their undisclosed and therefore unlawful departure from forest plan Guideline GFW-VEG-11 (requiring approximately 15 to 30 square feet of basal retention in two-aged harvests). AR 19417 (mandating that "[d]eviations from guidelines must be analyzed during project level analysis and documented in a project decision document"); *Cf.* AR 13485-86 (no documentation of GFW-VEG-11 in "Departures from Forest Plan Guidelines" document).

Project notes from late 2017 show that Defendants were planning to implement a new approach to meeting SFW-TES-12 by retaining potential Indiana bat roost trees within riparian corridors instead of scattered across the project's cutting units. AR 238. The notes indicate Defendants were planning to conduct field verification visits to determine whether the approach was viable. *Id.* Project notes from April of 2018 show that Defendants had decided to forgo the field verification exercises and to simply proceed under the assumption that enough suitable bat trees would be located within the riparian corridors. AR 385.

A January 2019 document in the EA analysis folder, labeled "Wildlife Mitigations – Marking Guidelines" states that U.S. Fish and Wildlife Service requested that Defendants field-verify that their proposed riparian and flight corridor bat tree retention approach satisfy the requirements of Standard 12. The document states: "Detailed notes should be taken on the size, species and number of trees found in these specific areas so that we can send to USFWS to verify this assumption and extrapolation to future units. If these two [Sunny Oaks parcels] do not verify the assumption then marking of bat leave trees will be needed within the cutting units outside of

14

the riparian/corridor/feathered edge areas in order to meet our Indiana Bat standard and guidelines." AR 10370.

Defendants' field-verification excursions later verified that their filter strip retention strategy would *not* satisfy the requirements of SFW-TES-12, because fewer than 12 loose barked trees per acre were found in the riparian/flight corridors. AR 5619-21. Defendants nonetheless decided that they would *not* mark retention trees outside of the riparian/flight corridors. AR 5607; AR 5617 ("Counting and marking additional future bat roost trees within all hardwood harvests to account for SFW-TES-12 is unnecessarily time-consuming and inefficient"). In other words, Defendants decided that they would not even try to satisfy the loose-barked tree retention requirements of FWS-TES-12. This was plainly contrary to law and arbitrary and capricious. *Native Ecosystems Council*, 418 F.3d at 961-965.

Remarkably, in response to their field verification data, Defendants determined that loose-barked trees do not exist in nature. AR 5607 ("It is acknowledged that the first part of the standard does not exist in nature and thus cannot be met"). This broad-brush determination defies common sense. It also defies the data Defendants relied upon. *See* AR 5642 (survey data showing, when one does the simple math, an average of 6.24 loose barked trees per acre in riparian retention strips alone). This represents slightly over half of the retention required by SFW-TES-12. Importantly, Defendants estimated that they could be able to satisfy SFW-TES-12 if they retained additional trees inside of the cutting areas, but decided not to because of "project objectives or desired future conditions." AR 5638 ("While there are ways of potentially meeting the first part of the standard, such as retaining additional retention trees within hardwood harvest areas, those methods may not help us meet project objectives or desired future conditions").

15

Specifically, the record reflects that Defendants opted not to retain loose-barked trees in the Sunny Oaks harvest areas on the basis that doing so would likely necessitate retaining, according to their estimates, somewhere between 22-30 square feet of basal area, not including shagbark hickories. AR 5636-39.[8]

The Wayne's forest plan contains a forest-wide guideline requiring the retention of approximately 15 to 30 square feet of basal area per acre in two-aged regeneration harvests:

> **GFW-VEG-11:** Under two-aged regeneration harvests, leave approximately 15 to 30 square feet of basal area per acre uncut. Select leave tree species and distribution to meet wildlife habitat objectives.

AR 19447. Throughout comment and objection, however, Defendants insisted on limiting the Project's harvest area tree retention to no more than 15 square feet of basal area per acre. AR 13472 (eliminating OEC's white oak retention alternative on 15 square foot grounds).[9] This is a clear departure from GFW-VEG-11. Zero to 15 square feet, which Defendants insist upon, and "approximately 15 to 30 square feet" are two separate and plainly inconsistent directives.[10]

Defendants departed from the forest plan's two-aged harvest retention guideline, GFW-VEG-11, without documenting and disclosing their departure to the public. This departure without disclosure violates the terms of the forest plan, NFMA, and NEPA. *Native Ecosystems Council*, 418 F.3d at 961-65. Defendants also violated NFMA, the forest plan, and NEPA by treating this departure as a new policy that foreclosed analysis of alternatives that exceed 15 square feet of tree basal area per acre. *Bob House v. United States Forest Serv.*, 974 F. Supp.

---

[8] Although the record is muddled on this point, it appears Defendants may not have been counting shagbark hickories in their estimates when they determined loose barked trees do not exist in nature.

[9] For context, "[s]tands proposed for oak treatments within Alternative 2 average 64% oak and 112 sq. ft. of basal area." AR 13680.

[10] Even though the Guideline includes the word "approximately," there is no "genuine ambiguity" as to its meaning in this context. *Kisor v. Wilkie*, 139 S. Ct. 2400, 2414 (2019). Defendants never disclosed an interpretation of GFW-VEG-11 and are therefore not entitled to any interpretational deference, at any rate. *Id.* at 2421 ("No *ad hoc* statements or *post hoc* rationalizations need apply.").

1022, 1034 (E.D. Ky. 1997) (holding Forest Service's Indiana bat habitat policies were *de facto* forest plan guidelines that required public amendment process under NFMA and NEPA). The 15 square foot maximum policy is a *de facto* forest plan amendment. Forest plan amendments are subject to public notice and comment procedures, which Defendants did not avail themselves of in this matter. *Id.*

Close consideration of the facts above reveals a fascinating dilemma. Given conditions on the ground (6.24 loose-barked trees per acre) coupled with the mandatory terms of SFW-TES-12, Defendants were confronted with two lawful choices. They could either: (A) implement all Sunny Oaks hardwood cuts as two-aged retention harvests (with approximately 22-30 sq ft basal area retention), or (B) amend the forest plan. Instead, Defendants chose option (C): determine that loose-barked trees do not exist in nature and declare the Indiana bat retention Standard nullified (thereby preserving the *de facto* 15 square foot maximum retention guideline). AR 5617 ("the first part of SFW-TES-12 is not possible to meet in average forest conditions on the Wayne, thus, nullifying this requirement."). Choice (C) was arbitrary, capricious, and contrary to law.

Given their near-unique status as a suitable loose-barked species and their numerical position in the Forest, it is likely that the great majority of the trees Defendants needed to retain in the Project's harvest areas would have been white oaks. *See* AR 5631 (average of 6.9 white oaks of 11+ inch diameter per acre on the Wayne National Forest; 1.2 shagbark hickories of the same size per acre).[11] In other words, absent a plan amendment, the requirements of the Wayne's forest plan and conditions on the ground dictated that the logical, and perhaps only, way to lawfully implement a project like Sunny Oaks was through a project alternative that retained all

---

[11] These figures also strongly suggest that the vast majority of live trees Defendants counted as loose-barked during their field verification trips were white oaks.

17

or most of the white oaks in the project's stands. Precisely the sort of project alternative Plaintiff first advanced during Scoping and then carried through objection. E.g., AR 14846-54; 14847.

Meaningful discussion of white oak is conspicuously absent from Defendants' records pertaining to their new "approach" to Standard 12.[12] AR 5613-5642. The absence of white oak from Defendants' SFW-TES-12 discussion is embodied in the following passage of their main justification document:

> If "loose bark" is defined as naturally flaking, exfoliating, peeling, or sloughing, it can be found on a few specific species of trees, typically after they are somewhat larger than 6 inches diameter. However, not all of these flaky-barked trees have the necessary bark characteristics to provide suitable cover that roosting bats seek. For instance, the exfoliating and peeling bark on sycamore and river birch is too thin to offer even individual bats any protection. The exfoliating bark of larger live shagbark or shellbark hickories, and a few oak and maple species have occasionally been documented as roost trees for Indiana bats (Gardner et al. 1991, Callahan et al. 1997, USFWS 2007, Bergeson et al. 2018), so the actual tree species list that could potentially meet this condition is quite limited.

AR 5621. The passage states that the types of loose bark on live trees suitable for Indiana bats are "quite limited" to a few select species, including "a few oak" species. *Id*. Defendants cite to the Indiana Bat Draft Recovery Plan (USFWS 2007) and to a study (Bergeson et al. 2018) for this principle. But they do not provide pin cites or quotations. Plaintiff will do so here:

> Biological opinions for actions taken on National Forests and by other Federal agencies also have detailed terms and conditions to minimize incidental take associated with the proposed action. Terms and conditions include such actions as retaining snags and large live shagbark and shellbark hickories and *white oaks*[.]

AR 21795 (USFWS 2007) (emphasis added). Put simply, the U.S. Fish and Wildlife Indiana Bat recovery plan specifies the three species of loose barked trees that are commonly retained in national forests as Indiana bat habitat. One of those three species is white oak.

---

[12] *Cf.* ECF 24 at DocID 1919 (Defendants arguing that "Forest Service thoroughly assessed the Project's potential impact on white oak").

18

> [B]ecause Indiana bats use a wide variety of trees, managers in midwestern forests could promote many different tree species; we suggest those that are tall and that have ==large slabs of exfoliating bark when alive (e.g., shagbark hickories and white oaks) or dead (e.g., elms, hickories, oaks, pines)==

AR 20839 (Bergeson et al. 2018) (highlight in original). Again, here white oak is classified with shagbark hickory as one of the very few live Indiana bat retention trees of choice.

The above excerpts illustrate Defendants' arbitrary, capricious, and unlawful treatment of the white oak issue. With respect to their determination that these trees do not exist in nature, with respect to their undisclosed and undocumented departure from GFW-VEG-11, with respect to their refusal to meaningfully consider substantial white oak or oak retention as a project alternative, and with respect to their "nullification" of SFW-TES-12. Defendants have violated NFMA, the Forest Plan, and NEPA. *Native Ecosystems Council*, 418 F.3d at 965 (because Forest Service's analysis was based on an unlawful deviation from a Forest Plan standard, "the agency did not take a 'hard look' at the project's true effect and failed to inform the public of the project's environmental impact."); *Bob House*, 974 F. Supp. at 1034.

## CONCLUSION

For the reasons stated above and in Plaintiff's opening brief, Plaintiff Ohio Environmental Council respectfully requests that this Court grant its motion for summary judgment on all claims and deny the Federal Defendants' motion for summary judgment in its entirety. Respectfully submitted this 16th day of September, 2022.

**CERTIFICATE OF SERVICE**

Under penalty of perjury, I certify that on September 16th, 2022 I filed the foregoing Opposition to Federal Defendants' Cross-Motion for Summary Judgment and Reply in Support of Plaintiff's Motion for Summary Judgment on behalf of Plaintiff Ohio Environmental Council via the CM/ECF system which will provide electronic service to all counsel of record.

DATED: September 16, 2022

          */s/ Nathan G. Johnson*
          Nathan G. Johnson
          (OH State Bar No.0082838)
          *Trial Attorney for Ohio Environmental Council*
          OHIO ENVIRONMENTAL COUNCIL
          1145 Chesapeake Ave., Suite I
          Columbus, OH 43212
          Tel: (614) 487-5841
          NJohnson@theOEC.org