**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **OHIO ENVIRONMENTAL COUNCIL,** | : | |
| | : | |
| **Plaintiff,** | : | **Case No. 2:21-cv-04380** |
| | : | |
| **v.** | : | **Chief Judge Algenon L. Marbley** |
| | : | |
| **U.S. FOREST SERVICE,** *et al.*, | : | **Magistrate Judge Kimberly A. Jolson** |
| | : | |
| **Defendants.** | : | |

**OPINION & ORDER**

## I.   INTRODUCTION

Plaintiff Ohio Environmental Council ("OEC"), an Ohio non-profit environmental organization, brings this action against the United States Forest Service ("USFS" or "the Forest Service"), Randy Moore in his official capacity as the Chief of the USFS, Carrie Gilbert in her official capacity as the Forest Supervisor of the Wayne National Forest ("the Wayne" or "the Forest"), and Tim Slone in his official capacity as the District Ranger for the Ironton Ranger District of the Wayne (collectively, "Defendants").  OEC challenges the Forest Service's Final Decision Notice and Finding of No Significant Impact ("FDN-FONSI") for the Sunny Oaks Project ("SOP" or "the Project"), alleging that the decision violates the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. §§ 4321–4370h, and the National Forest Management Act of 1976 ("NFMA"), 16 U.S.C. §§ 1600–1687.

Now before the Court are the parties' cross-motions for summary judgment.  (*See* Pl.'s Mot. for Summ. J., ECF No. 18; Defs.' Cross-Mot. for Summ. J., ECF No. 24).  The Ohio Forestry Association ("OFA") has also filed an amicus curiae brief in support of Defendants' summary judgment motion.  (*See* Br. of Amicus Curiae, ECF No. 25-1).  For the reasons set forth below, the

1

Court **GRANTS IN PART and DENIES IN PART** Plaintiff's motion and **GRANTS IN PART and DENIES IN PART** Defendants' motion.

## II. BACKGROUND

### A. Factual Background[1]

#### 1. History and Context of the Wayne National Forest

The Wayne National Forest is located in 12 counties across southeast Ohio, in the foothills of the Appalachian Mountains. AR 19412. The Wayne consists of a patchwork of federal and private land. The Wayne presently includes about 244,000 acres of federal land; the Proclamation Boundary for the Wayne, which was established in 1934 and sets the outer limits of the land that the Forest Service is authorized to acquire and incorporate into the Wayne (assuming willing sellers and available funds), covers approximately 875,000 acres. *See Land Statistics*, U.S. FOREST SERV., https://www.fs.usda.gov/detailfull/wayne/about-forest/?cid=fsm9_006090. The Wayne consists of three units, two of which are managed out of the Athens Ranger District and one of which is managed by the Ironton Ranger District ("IRD"). The Sunny Oaks Project, the subject of this case, is located within the IRD.

The Wayne is governed pursuant to NFMA and the Multiple-Use Sustained-Yield Act of 1960 ("MUSYA"), 16 U.S.C. §§ 528–31. NFMA requires the Forest Service develop a governance plan for each national forest, which set out a framework for the goals, standards, and objectives of the Forest Service's management of each forest. *See* 16 U.S.C. § 1604. The most recent Forest Plan for the Wayne was promulgated in 2006 (officially called the "Final Revised

---

[1] In cases involving an agency's decisionmaking, filed pursuant to the Administrative Procedure Act, "the focal point for judicial review should be the administrative record already in existence." *Camp v. Pitts*, 411 U.S. 138, 142 (1973). Accordingly, the factual recitation set forth below relies on the administrative record ("AR") submitted by Defendants, except where otherwise noted. (*See* ECF Nos. 14, 23, 34).

Land and Resource Management Plan") and includes, among other policies, forest-wide standards ("SFWs") and forest-wide guidelines ("GFWs"). *See* AR 19404–19715. As relevant to this action, SFW-TES-12, which is intended to protect the roosting habitats of the endangered Indiana bat, mandates that:

> With all hardwood timber harvests, retain a minimum of 12 live trees per acre (averaged over the cutting unit) of any species that are six inches or more dbh with large areas of loose bark, unless they pose a safety hazard.

> In addition to these, retain live preferred roost trees, when present, to provide a supply of future roost trees (i.e., large, overmature trees). See Appendix D for list of tree species preferred as roost trees by Indiana bats. See Table 2-3 for preferred tree sizes. Consult with U. S. Fish and Wildlife Service regarding exceptions that may be needed to minimize adverse effects to other resources or human health and safety.

AR 19442. Second, GFW-VEG-11 dictates that:

> Under two-aged regeneration harvests, leave approximately 15 to 30 square feet of basal area per acre uncut. Select leave tree species and distribution to meet wildlife habitat objectives.

AR 19447. Pursuant to NFMA, all actions and projects within the Wayne must be consistent with the 2006 Forest Plan. *See* 16 U.S.C. § 1604(j). Deviations from standards in the Forest Plan require formal amendment processes, but deviations from guidelines do not.

The 2006 Forest Plan also sets out a number of objectives for the Forest Service's management of the Wayne, including: (1) promoting oak-hickory ecosystems "by improving conditions for oak regeneration"; (2) creating early successional hardwood habitats, also known as "young, brushy forest" habitats; and (3) designating commercial timber harvests. AR 19436; *see* AR 19446. As these objectives are three of the four stated purposes for the Sunny Oaks Project, the Court explains each in greater detail.

First, "young, brushy" forest habitats consist of "dense thickets of young shrubs and trees" under ten years old, including "lots of herbaceous plants, lots of flowering plants, [and] lots of

berry producing shrubs." *Id.*  This type of habitat is important for over one-third of the land animals, as well as numerous bird species, in the Wayne.  AR 13516.  The Wayne, however, is lacking in young, brushy habitats; though the 2006 Forest Plan suggests that about 7,300 acres of the Forest should be young, brushy habitat (roughly 3% of the Forest), there are currently only 156 acres of young, brushy habitat (0.06% of the Forest).  *Id.*  The lack of young, brushy habitat has contributed to a steep decline in various bird species in the Wayne.  AR 13516–17.

Second, oak-hickory ecosystems are highly important for plant and wildlife diversity; oak trees provide cover and food for a variety of animals.  AR 13520, 19822.  In particular, the American white oak (*Quercus alba*) is considered a "singularly important ecological keystone species."  (Pl.'s Mot. for Summ. J. at 9, ECF No. 18).  Oak-hickory is the most common forest type in the Wayne, comprising 47% of the Forest as of 2006, but is on the decline and is less prevalent in younger tree stands (specifically, in stands younger than 70 years old), due to the difficulty of regenerating oaks—*i.e.*, growing new oak trees.  AR 19823.  Oak-hickory ecosystems require active management to promote the growth of younger oaks, in part because oaks are long-lived but produce fewer acorns as they age and in part because oak trees are disturbance-dependent. AR 13522–23.  What this means is that young oaks, which have intermediate shade tolerance, grow best as seedlings when there is an overstory (or canopy) of larger, mature oaks blocking sunlight; but in order for oak saplings to develop to full maturity and thrive, they need a "disturbance" at some point that removes the overstory and exposes them to full sunlight.  *See* AR 13523.  Accordingly, the Forest Service has determined that the percentage of the Wayne that is made up of oak-hickory stands will decline without active management promoting oak regeneration (*i.e.*, by thinning out some percentage of existing mature oaks).  *See* AR 13533.

4

Third, the Wayne was first established pursuant to the Weeks Act of 1911, Pub. L. No. 61-435, 36 Stat. 961 (1911), which authorized the purchase of lands for the National Forest System for timber harvesting.  As such, a long-standing objective of governance of the Wayne has been to provide commercial timber harvests.  *See* AR 19413.  But historically, timber harvesting in the Wayne was not substantial.  Under the 2006 Forest Plan, the Forest Service estimated that it would implement up to 1,925 acres of even-aged timber harvests in the first decade of the plan (and up to 2,257 acres in the second decade), AR 19632, but, in fact, actually implemented less than 200 acres of harvests.  *See* AR 19392.  The Wayne was assigned timber harvest targets in the range of 0 to 8407 centum cubic feet ("CCF") for the 2007–2017 fiscal years, AR 12192, before the target jumped up to 14,607 CCF for fiscal year 2018[2] and was projected at the time to continue increasing to approximately 32,000 CCF for the fiscal years 2021 through 2023.  *See* AR 540.

## 2.    *The Sunny Oaks Project*

In April 2018, the Forest Service issued a notice proposing the Sunny Oaks Project and requesting comments on the proposed scope of the Project.  AR 541–42.  The proposal noted the Project had four stated purposes: (1) create young, brushy forest that is lacking in the area; (2) regenerate oak forest in areas where it is favored so that forest type is maintained across the landscape; (3) address disease and illness;[3] and (4) contribute to the local economy through commercial timber harvests.  AR 13515.  The OEC submitted scoping comments.  *See* AR 981–

---

[2] One CCF corresponds to one hundred cubic feet.

[3] Oak-hickory ecosystems are vulnerable to a variety of insect and disease threats.  *See, e.g.*, AR 13549 (discussing an ice storm in 2003 that hit southeastern Ohio and brought a wave of pathogens that led to a decline in oak population).  Portions of the Ironton Ranger District have been designated as in need of projects addressing insect and disease threats, including red oak borer, oak wilt, jumping oak gall, bacterial leaf scorch, sudden oak death, chestnut blight, and gypsy moth.  *See* AR 13525; *see, e.g.*, AR 1672 (studying the effect of phytophthora, a soil-based pathogen, on oaks).  In fact, the forest that now constitutes the Wayne was dominated by chestnut-oak ecosystems for most of its history, as opposed to oak-hickory ecosystems.  Widespread chestnut blight killed much of the chestnut population  in the early 1900s, precipitating a transition from chestnut-oak to oak-hickory ecosystems.  *See* AR 19822.

89; *see also* AR 990–1266 (attachments to OEC comments). After the scoping period, the Forest Service prepared specialist reports on the potential effects of the Project proposal and one alternative, *see, e.g.*, AR 5293–5368 (biological assessment prepared by the Fish and Wildlife Service), and issued an Environmental Assessment ("EA") in December 2018.[4] The EA and accompanying material were communicated to the public in the form of PowerPoint presentations. *See* AR 9658, 13097–408, AR 13513–92. The Forest Service then invited public comment. The OEC submitted a comment, including an extensive literature review focused on the white oak. *See* AR 10423–39; *see also* AR 10443–831, 10843–2800 (attached literature).

The EA evaluated the potential impacts of two approaches to the Project: the Proposed Action and Alternative 2, which had been developed in response to scoping comments submitted by the public. AR 13535–69; *see* AR 13652. The Proposed Action consisted of clearcut and shelterwood harvests, supplemental tree planting, timber stand improvements ("TSI"), and "connected" activities. *See* AR 13535–69. Both clearcut and shelterwood are types of commercial timber harvests. A "clearcut" is a harvest of all trees in a designated stand (with certain exceptions, such as for trees that are required to be retained under the 2006 Forest Plan guidelines and for trees along streams). AR 13536. A "shelterwood cut" involves multiple harvests. First, a portion of the forest canopy (*i.e.*, the larger, mature trees) is removed. This is called the "establishment harvest." Younger trees, such as seedlings and saplings, are given a few years to grow with a less dense overstory overhead and therefore more sunlight. Then, after 5–15 years, depending on the development of the understory trees, a second harvest cuts down all the remaining trees that

---

[4] An environmental assessment typically discusses: (1) the purpose and need for the proposed action; (2) alternatives; (3) the environmental impacts of the proposed action and alternatives; and (4) the agencies and persons consulted. *See National Environmental Policy Act Review Process*, ENV'T PROT. AGENCY, https://www.epa.gov/nepa/national-environmental-policy-act-review-process (Oct. 5, 2022).

comprised the initial overstory at the time of the establishment harvest. This is called the "overstory removal harvest" or "removal harvest." The precise timing of the removal harvest depends on when a sufficient number of young trees have grown to a certain height and degree of root development (in this case, to 4.5 ft tall). This sequence is intended to allow seedlings enough time to develop in intermediate shade and then, when they are ready for further growth, to remove the overstory and allow the now-sapling the opportunity to develop to maturity in full sunlight. *Id.*

The Proposed Action also included supplemental tree planting, primarily in native pine stands, as well as TSI, which encompasses various treatments that are used either before or after a timber harvest to promote the growth of certain trees or types of trees. *See* AR 13543–44. Examples of TSI treatments include prescribed fire, which entails setting fire to dried leaves on the forest floor to kill competitors of desired trees, manual felling of trees (specifically, competitor trees that are crowding desired trees), and the use of herbicide. AR 13544–45. The Proposed Action would use prescribed fire on 2,000 to 4,000 acres of the Wayne each year. *Id.* Finally, the Proposed Action incorporates a number of "connected actions"—a catch-all term referring to constructing new roads, rebuilding existing roads, setting up log lines, and other actions that enable timber harvests. *See* AR 13546. In total, the Proposed Action included 1,595 acres of clearcut harvest, 1,145 acres of shelterwood harvest, approximately 60 acres of log landings, 180 acres of skid roads, 10 miles of new road construction, 17 miles of road reconstruction, 2–4,000 acres of prescribed fire, and 41 miles per year of firelines. AR 13548.

In the EA, the USFS also analyzed Alternative 2, which was formulated to address some of the key issues that emerged from the public scoping period, including concerns about potential flooding, impacts on scenery, and the use of clearcut harvests. AR 13567–13570. Alternative 2 would decrease the number of tree stands designated for clearcut harvest by 800 acres, allocating

7

280 acres of the 800 for shelterwood harvest and the remainder for two-aged cuts or re-inventory (two new options that were not included in the original proposal). AR 13571. Specifically, stands that had an "oak regeneration" objective, which were previously designated for clearcut harvests, were re-designated as two-age harvest stands. AR 13572. A two-age harvest, also known as a "clearcut with reserves," is a variation on a clearcut harvest. The approach begins with a clearcut that retains a predetermined number of trees in the stand, instead of cutting all trees in the stand.[5] The retained trees are not harvested in a later removal cut (unlike in a shelterwood harvest); they continue to grow, alongside any existing understory vegetation, younger trees, and seedlings from acorns from the retained trees. *Id.* Eventually, the stand is left with trees in two age groups—the retained trees and the trees that grow after the initial harvest—hence the "two-age" label. *Id.*; AR 13575. The above-mentioned approaches (*i.e.*, two-age, shelterwood, clearcut) are all considered "even-aged" harvests, because the new trees that grow in the standard after the harvest are all of the same age.

After receiving public comments on the EA, the Forest Service issued a Draft Decision Notice and Finding of No Significant Impact ("DDN-FONSI"), signed by Tim Slone, the District Ranger, in which the Forest Service proposed adopting a modified version of Alternative 2 labeled "Updated Alternative 2." AR 13416–34. Pursuant to regulation, the public was allowed an opportunity to object to the DDN-FONSI. *See* AR 13443–44. OEC submitted an objection. *See* AR 13819–37. The Forest Service considered and responded to the objections, and issued its FDN-FONSI on November 19, 2020, in which it adopted Updated Alternative 2 without further

---

[5] The Forest Service proposed leaving a maximum of 15 square feet of basal area. AR 13572. Basal area is a measurement of how many trees are in a given area, or, more technically, the stand density. It is defined as the average amount of an area (typically an area) occupied by the cross-sections of the tree trunks in that area, as measured at breast height (which is usually about 4.5 ft or 1.3 m above the ground).

modification.  AR 19316.  The FDN-FONSI concluded that the preparation of an environmental impact statement ("EIS") was not necessary, as the Project would not lead to any significant environmental impacts, and therefore authorized the project.  *See* AR 19318–38.

Updated Alternative 2 is, according to Defendants, intended to address concerns expressed by OEC and others that some of the stands designated for shelterwood cuts would be unable to regenerate oaks in light of insufficient oak seedlings and saplings.  *See* AR 19321.  For shelterwood harvests, Updated Alternative 2 adopts an "adaptive approach" that is meant to provide the Forest Service with flexibility to choose different harvest techniques depending on the conditions in a particular stand.  Under this approach, a shelterwood harvest may be implemented in one of three ways:

1) A two-stage shelterwood as described in the EA, including an establishment and overstory removal harvest.  The Forest Service specified that where specialist observations show that a stand has sufficient oak regeneration to undertake this young brushy forest creation method while aiming to regenerate for oak, this harvest will be selected.

2) A three-stage shelterwood harvest, including a first entry of a light removal, followed then by two more entries similar to the two-stage shelterwood as described in the EA.  The Forest Service explained that where stand data shows that additional oak regeneration needs to develop to optimize the likelihood of oak regeneration in the stand, this harvest will perform a light preparatory harvest to bring sun to the understory for regenerating oak before moving to the two-stage shelterwood process.

3) A TSI treatment (non-commercial stand treatment), followed by a clearcut with reserves, which would result in a two-aged stand.  Here, the Forest Service explained that this method would be selected where a stand needed treatment to encourage oak growth but did not have enough overstory trees to support more than one commercial harvest.

AR 19322–23.  The efficacy of whichever harvest approach is taken for oak regeneration will be monitored through "stocking surveys following harvest"; if the harvest results in regeneration consisting predominantly of species other than oak, the Forest Service will employ "appropriate

9

TSI activities." AR 19323. Further, even in the stands where the adaptive approach fails to regenerate oak successfully, the Forest Service will have created young, brushy habitats, thus accomplishing at least one objective of the Project anyway. AR 19323; *see also* AR 19325.

In total, the final version of the Sunny Oaks Project authorizes 2,485 acres of timber harvest across the Ironton Ranger District, in addition to TSI and ancillary activities. The authorized harvests include 712 acres of clearcut, 1,408 acres of shelterwood (implemented via the adaptive approach described above), and 365 acres of two-aged harvests. AR 13468. The Forest Service began issuing timber sales for the Project in July 2021.

### B. Procedural Background

Plaintiff Ohio Environmental Council filed suit in this case on September 9, 2021, against the U.S. Forest Service, Randy Moore in his official capacity as Chief of the Forest Service, Carrie Gilbert in her official capacity as Forest Supervisor for the Wayne National Forest, and Tim Slone in his official capacity as District Ranger for the Ironton Ranger District. OEC has been granted leave to amend its complaint twice. (*See* Op. & Order, ECF No. 21; Order, ECF No. 44). In the Second Amended Complaint, OEC alleges that Defendants violated NEPA by: (1) failing to take a "hard look" at the Project's; (2) failing to consider an adequate range of project alternatives; (3) failing to prepare an EIS; and (4) withholding material project information. (Second Am. Compl. ¶¶ 133–63, ECF No. 45). OEC further alleges that Defendants violated NFMA by unlawfully deviating from standards and guidelines set forth in the 2006 Forest Plan. (*Id.* ¶¶ 175–85). Both parties have filed motions for summary judgment, which are ripe for this Court's review.

### III. STANDARD OF REVIEW

Whereas a motion for summary judgment pursuant to Fed. R. Civ. P. 56 requires a court to determine whether there are genuine issues of material fact, the "usual rules governing summary

judgment do not apply" in cases brought pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551, 553–59, 701–06. *Integrity Gymnastics & Pure Power Cheerleading, LLC v. U.S. Citizenship and Immigr. Servs.*, 131 F. Supp. 3d 721, 725 (S.D. Ohio 2015) (citing *City of Cleveland v. Ohio*, 508 F.3d 827, 838 (6th Cir. 2007); *N. Carolina Fisheries Ass'n, Inc. v. Gutierrez*, 518 F. Supp. 2d 62, 78–79 (D.D.C. 2007)). Courts do not ask, for example, whether a genuine issue of material fact exists, as the court's review is limited to the administrative record and does not entail independent factfinding. *See Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1472 (9th Cir. 1994). Instead, courts must ask "whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Ohio Valley Env't Coal. v. Hurst*, 604 F. Supp. 2d 860, 879 (S.D. W.Va. 2009) (quoting *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006)). Summary judgment is often appropriate when "a party seeks review of agency action under the APA [because] the entire case on review is a question of law." *Noroozi v. Napolitano*, 905 F. Supp. 2d 535, 541 (S.D. N.Y. 2012) (internal quotation marks and citation omitted); *see also Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 778 (9th Cir. 2006).

## IV.    STATUTORY BACKGROUND

Judicial review of an administrative agency's FONSI decision (and, concurrently, decision not to prepare an EIS) proceeds under the Administrative Procedure Act, as neither NEPA nor NFMA authorize a private right of action. *Friends of Tims Ford v. Tenn. Valley Auth.*, 585 F.3d 955, 964 (6th Cir. 2009) (citing 5 U.S.C. §§ 701–06; *Sierra Club v. Slater*, 120 F.3d 623, 630–31 (6th Cir. 1997)); *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1238 (9th Cir. 2005). Under the APA, federal courts review agency actions under the deferential "arbitrary and

capricious" standard of review.  *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 377 (1989).  A

decision is deemed "arbitrary and capricious" if:

> [T]he agency has relied on factors which Congress has not intended it to consider,
> entirely failed to consider an important aspect of the problem, offered an
> explanation for its decision that runs counter to the evidence before the agency, or
> is so implausible that it could not be ascribed to a difference in view or the product
> of agency expertise.

*Meister v. U.S. Dep't of Agric.*, 623 F.3d 363, 371 (6th Cir. 2010) (quoting *Motor Vehicle Mfrs.*

*Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983)).  Although courts

must conduct a "searching and careful" inquiry as to "whether the [agency] decision was based on

consideration of the relevant factors and whether there has been a clear error of judgment," *id.* at

378 (quoting *Bowman Transp., Inc. v. Ark.-Best Freight Sys.*, 419 U.S. 281, 285 (1974); *Citizens*

*to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)), it is not the role of the

reviewing court to "substitute its judgment for that of the agency." *Integrity Gymnastics*, 131 F.

Supp. 3d at 726 (S.D. Ohio 2015) (citing *Marsh*, 490 U.S. at 376; *Simms v. Nat'l Highway Traffic*

*Safety Admin.*, 45 F.3d 999, 1003 (6th Cir. 1995)); *see also Anglers of the Au Sable v. U.S. Forest*

*Serv.*, 565 F. Supp. 2d 812, 821 (E.D. Mich. 2008) ("Because analysis of the relevant documents

'requires a high level of technical expertise,' the Court must defer to 'the informed discretion of

the responsible federal agencies.'" (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976))).

Judicial review is confined to ensuring that "the agency adequately studied the issue and took a

hard look." *Klein v. U.S. Dep't of Energy*, 753 F.3d 576, 580 (6th Cir. 2014).  The "hard look"

standard is satisfied as long as the agency "considered the pertinent evidence, examined the

relevant factors, and articulated a satisfactory explanation for its action." *Integrity Gymnastics*,

131 F. Supp. 3d at 726 (quoting *Noroozi*, 905 F. Supp. 2d at 541).

NEPA is an unusual statute: although it "declares a broad national commitment to protecting and promoting environmental quality," *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989) (citing 42 U.S.C. § 4331), it "does not mandate particular results." *Id.* (internal citations omitted). Instead, it is an "action-forcing" statute—*i.e.*, NEPA requires federal agencies to follow certain processes before embarking on actions that significantly affect the human environment. But once "the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs" and proceeding with the action. *Id.* (internal citations omitted).

Among the procedural requirements of NEPA is the EIS, which must be prepared by federal agencies for all "major Federal actions significantly affecting the quality of the human environment" and consists of a "detailed statement" of the environmental impact of the proposed action, any unavoidable adverse environmental impacts, alternatives, and more. 42 U.S.C. § 4332(C). NEPA also established the Council on Environmental Quality ("CEQ"), which issues the implementing regulations of NEPA. *See* 42 U.S.C. § 4321. The CEQ has "authorized agencies to first prepare a less burdensome environmental assessment as a method for determining whether a proposal needed an environmental impact statement." *Ky. Riverkeeper, Inc. v. Rowlette*, 714 F.3d 402, 408 (6th Cir. 2013) (citing 40 C.F.R. § 1508.9); *see Friends of Fiery Gizzard v. Farmers Home Admin.*, 61 F.3d 501, 504 (6th Cir. 1995) (describing the EA as a "screening device").

An EA is less comprehensive than an EIS, but still "require[s] the authorizing agency to consider the environmental impacts of its proposals." *Id.* (internal citations omitted); *see also* 40 C.F.R. § 1508.9 (describing an environmental assessment as a "concise public document" that includes "brief discussions of the need for the proposal, of alternatives . . . , of the environmental

impacts of the proposed action and alternatives, and a listing of agencies and persons consulted"). The EA is intended to enable the agency to decide if an EIS is required (*i.e.*, if the agency concludes in the EA that its project will have a "significant impact" on the environment). *See id.* § 1508.9(a)(1). CEQ regulations require agencies consider the "context" and "intensity" of a proposed action and explain in an EA whether these factors suggest that an EIS is necessary. *See id.* § 1508.27. If an agency determines that an EIS is not required, the agency issues a Finding of No Significant Impact ("FONSI"), *see id.* § 1501.6, in which it must provide a "convincing statement of reasons why potential effects are insignificant." *Save the Yaak Committee v. Block*, 840 F.2d 714, 717 (9th Cir. 1988).

NFMA requires that the Forest Service develop a land management plan for each National Forest. *See* 16 U.S.C. § 1604(a). The management plans are intended to "identif[y] the resource management practices, the projected levels of production of goods and services, and the location where various types of resource management may occur." *Anglers of the Au Sable*, 565 F. Supp. 2d at 837 (E.D. Mich. 2008) (quoting *Northwoods Wilderness Recovery, Inc. v. U.S. Forest Serv.*, 323 F.3d 405, 407 (6th Cir. 2003)). Projects within a National Forest must be consistent with the applicable forest plan. 16 U.S.C. § 1604(i). If a proposed project or activity is inconsistent with the forest plan, the Forest Service may: (1) modify the project or activity to make it consistent; (2) reject the proposal or terminate the project; or (3) "[a]mend the plan contemporaneously with the approval of the project or activity so that it will be consistent with the plan as amended." *Anglers of the Au Sable*, 565 F. Supp. 2d at 812 (citing 36 C.F.R. § 219.8(3); *Colo. Off-Highway Vehic. Coal. v. U.S. Forest Serv.*, 357 F.3d 1130, 1132 (10th Cir. 2004)).

## V.     LAW & ANALYSIS

OEC alleges that Defendants violated NEPA because their decision to issue a FONSI and not prepare an EIS was arbitrary and capricious; OEC also alleges that Defendants have violated NFMA because the Sunny Oaks Project is inconsistent with the standards and guidelines set forth in the 2006 Forest Plan (specifically, SFW-TES-12 and GFW-VEG-11.  The Court considers each claim in turn.

### A.     Failure to Prepare an Environmental Impact Statement

The Court assesses the Forest Service's decision not to prepare an EIS by looking to the implementing regulations of NEPA, in which the CEQ has set out the conditions under which a project warrants an EIS.[6]  Typically, agencies have "considerable discretion" in determining whether an EA should lead to an EIS, *Ky. Coal. Ass'n, Inc. v. Tenn. Valley Auth.*, 804 F.3d 799, 804 (6th Cir. 2015), but an EIS is required where a plaintiff can show "substantial questions whether [the] project may have a significant effect."  *Klamath Siskiyou Wildlands Ctr. v. Boody*, 468 F.3d 549, 562 (9th Cir. 2006) (quoting *Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146, 1150 (9th Cir. 1998)).  As set forth in the CEQ regulations, "significantly" in the NEPA context "requires considerations of both context and intensity."  40 C.F.R. § 1508.27.[7]  Context is about the scope of the proposed action, against the background of "society as a whole (human, national),

---

[6] OEC's Complaint and Second Amended Complaint suggest that Defendants violated NEPA in four different ways: (1) failing to take a hard look; (2) failing to consider an adequate range of project alternatives; (3) failing to prepare an EIS; and (4) withholding material project information.  (*See* Second Am. Compl. ¶¶ 145–63, ECF No. 45). In its Motion for Summary Judgment, OEC only argues that Defendants have failed to prepare an EIS.  (*See generally* Pl.'s Mot. for Summ. J., ECF No. 18).  OEC touches upon its second claim cursorily in its reply brief.  (*See* Pl.'s Reply Br. at 10–11, ECF No. 38).  But arguments raised for the first time in a reply brief must be disregarded.  *See Ross v. Choice Hotels Int'l*, 882 F. Supp. 2d 951, 958 (S.D. Ohio 2012); *see also Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008).

[7] Defendants have cited to the previous version of CEQ regulations, because the regulations were updated on September 14, 2020, because the relevant decisions related to the Project were taken pursuant to the previous version. *See* Updated to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, 85 Fed. Reg. 43304 (July 16, 2020).  The Court does the same here, except where otherwise indicated.

the affected region, the affected interests, and the locality." *See id.* § 1508.27(a).  Intensity, by contrast, looks to the "severity of impact" and involves a ten-factor assessment.  *See id.* § 1508.27(b).  OEC contends that the Forest Service, in concluding that the project will have no significant impact, failed to analyze properly the context of the Sunny Oaks Project and many of the intensity factors.  For the reasons that follow, this Court concurs with one of those arguments (specifically, that the Project poses highly uncertain effects), but rejects the others.

### 1. Context

The context factor "delimits the scope of the agency's action, including the interests affected." *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 731 (9th Cir. 2001); *see* 40 C.F.R. § 1508.27(a).  In the FDN-FONSI, the Forest Service explained why it believed that the context of the Sunny Oaks Project did not warrant the preparation of an EIS: simply put, the timber harvests authorized by the Project affect only 1% of the Wayne (about 2% of the IRD), and are staggered over 20 years.  *See* AR 19329–30 (footnotes omitted).  In other words, the scope of the Project is small, when situated within the context of the Wayne as a whole.  *See Buckeye Forest Council v. U.S. Forest Serv.*, 378 F. Supp. 2d 835, 848 (S.D. Ohio 2005) (discussing, with regards to context, that a proposed project only involved a "small amount of acreage . . . in a large forest"); *see also WildEarth Guardians v. Conner*, 920 F.3d 1245, 1262 (10th Cir. 2019).

OEC notes, however, that SOP will be the largest timber project in the Wayne in several decades.[8]  (*See* Pl.'s Mot. for Summ. J. at 25, ECF No. 18).  In fact, OEC suggests, the total acreage authorized for timber harvests (2,485 acres) exceeds the projections for either the first or second

---

[8] OEC discusses the "context" of the Project within its analysis of the first "intensity" factor, rather than as a stand alone factor.  It is unclear if this is intentional.  OEC also suggests that the "context" of the Project is "[t]he irretrievable loss of white oak from the landscape" nationwide.  (Pl.'s Mot. for Summ. J. at 26–27, ECF No. 18).  The Forest Service determined that this is a problem the Sunny Oaks Project is, in part, intended to address.  *See infra.*

decades of timber harvesting in the Wayne under the 2006 Forest Plan. (*Id.* at 25–26). The 2006 Forest Plan estimated that the Forest Service would implement up to 1,925 acres of even-aged timber harvest from 2006–16, and 2,257 acres of even-aged timber harvest from 2016–26. AR 19632; *see also* AR 19392 (noting that less than 200 acres of even-aged timber harvest had been implemented for the first decade). Both estimates are lower than the total acreage of the Project, but it is important to note that the Project will be implemented over two decades; thus, it is not the case that the Project will exceed the timber harvest projections in the 2006 Forest Plan on its own. *Cf. Northwoods Wilderness Recovery, Inc. v. U.S. Forest Serv.*, 323 F.3d 405, 411 (6th Cir. 2003) (finding timber sale project inconsistent with forest plan where the Forest Service had already authorized twice as much cutting as projected in the Forest Plan, before authorizing the project in dispute). In fact, it is consistent with the Forest Plan, given that it implements slightly more than a decade's worth of timber harvests across two decades. In light of the small size of the Project and its adherence to the timber harvest projections in the 2006 Forest Plan, Defendants' determination that the context of the Project did not warrant an EIS was not arbitrary and capricious.

### 2.    Intensity

OEC suggests that there are nine (9) intensity factors that, collectively, demonstrate that the Sunny Oaks Project is likely to have a significant environmental impact and, therefore, that the Forest Service should have prepared an EIS. *Cf. Cascadia Wildlands v. U.S. Forest Serv.*, 937 F. Supp. 2d 1271, 1283–84 (D. Or. 2012) (noting that, even where individual factors may not trigger an EIS, they might do so collectively); *Ocean Advocs. v. Army Corps of Eng'rs*, 402 F.3d 846, 864 (9th Cir. 2005) ("We have held that one of these factors may be sufficient to require preparation of an EIS in appropriate circumstances." (citing *Nat'l Parks & Conservation Ass'n*, 241 F.3d at

731)).  Defendants suggest that the ten factors dictate the opposite conclusion.  The Court discusses these factors in the same order and with the same groupings as the parties.

> a.  *Impacts that May Be Both Beneficial and Adverse*

In deciding whether to prepare an EIS, an agency must consider "both beneficial and adverse" environmental impacts of a proposed action.  40 C.F.R. § 1508.27(b)(1).  It is apparent from the record that the Forest Service carefully considered the Project's potential impacts on the neighboring watershed, the soil, wildlife, air, recreational uses, and heritage.  *See, e.g.*, AR 13202–46 (presentation about the potential watershed effects of the Sunny Oaks Project); AR 13273–304 (presentation about potential effects on soil); AR 13305–44 (plants presentation); AR 13389–408 (air effects presentation).  OEC does not dispute that Defendants considered these impacts, instead arguing that Defendants failed to consider the potential adverse effects of the Project on fungal networks and that Defendant's consideration of the adverse effects on the white oak population was clearly erroneous.

First, OEC argues that Defendants failed to consider an important adverse impact of the Project: the disruption caused by even-aged timber harvests on ectomycorrhizal networks.  (*See* Pl.'s Mot. for Summ. J. at 27–28, ECF No. 18).  The term "mycorrhiza" refers to the symbiotic association between a fungus and a plant; mycorrhizal networks are fungal networks connecting plants and fungi together.  Forests are interconnected ecosystems, linked together by these underground networks, which also help promote the establishment and growth of tree and other plant seedlings.  There are two main types of mycorrhizal networks: arbuscular mycorrhizal networks and ectomycorrhizal networks, which often compete with each other for underground dominance.  The primary difference between the two, as relevant to the case *sub judice*, is that oak-hickory ecosystems are served by ectomycorrhizal networks and tulip-maple ecosystems are

18

served by arbuscular networks.  The problem with the Sunny Oaks Project, according to OEC, is that even-aged timber harvests tend to disrupt ectomycorrhizal networks, and arbuscular networks respond more favorably in the wake of such disruption.  (*Id.* at 27).  Thus, after an even-aged timber harvest, it will be difficult for oak-hickory ecosystems to regenerate, without a strong ectomycorrhizal network already in place to help oak seedlings grow.  (*See id.* at 28).  Instead, tulip-maple ecosystems are more likely to take over, if arbuscular networks have the opportunity to replace ectomycorrhizal networks in the underground soil post-harvest.

Before turning to the merits of this claim, the Court must first consider a threshold issue— *i.e.*, whether OEC has waived this claim by failing to raise it properly during the administrative process.  While NEPA allows the public to participate in agency decision-making and agencies must discuss and address the public's concerns, *see* 36 C.F.R. pt. 218 (setting forth the Forest Service's administrative review process, including public engagement through the NEPA process), there are certain limits, chief among which is the requirement that a person "shall exhaust all administrative appeal procedures established by the Secretary."  7 U.S.C. § 6912(e).  In the case of the Forest Service, this means that public commenters must file an "objection," which is then documented in the administrative record.  *See* 36 C.F.R. §§ 218.1–.16.  Objections must specify the "specific issues related to the proposed project," detail "how the objector believes the [EA] specifically violates law, regulation, or policy . . . [and] demonstrates the connection between prior specific written comments on the particular proposed project or activity and the content of the objection."  36 C.F.R. § 218.8(d)(5)–(6).  The Forest Service must then provide a written response to each objection that "set[s] forth the reasons for the response," but does not need to provide a "point-by-point" rebuttal of each individual component of an objection.  36 C.F.R. § 218.11(b)(2).

OEC suggests that it "developed the record at length with scientific literature" during the public comment process about the threat that the Project poses to ectomycorrhizal networks, and therefore the goal of oak regeneration, but that the "Forest Service kept its eyes tightly shut on the issue of fungal networks and soils" and its only "response . . . suggest[ed] that mycorrhizal fungi would simply not be relevant to the Sunny Oak project's [sic] stated purposes and needs." (*Id.* at 27, 28). Specifically, in its objection to the DDN-FONSI, OEC wrote that:

> Literature submitted by OEC . . . made a strong case that intact oak forests support (and are supported by) fundamentally important ecto-mycorrhizal networks. These fungal networks are vitally important to the health and resiliency of forests— including response to disease and insect pressure, the success of oak seedlings, and the sequestration and storage of carbon. The OEC's comments further substantiated that heavy clearcutting and even-aged harvesting is especially destructive of these ectomycorrhizal networks and thereby of forest health and resiliency. Retaining intact ecto-mycorrhizal oak networks through substantial oak retention could be a powerful way to preserve forest health while still creating significant early successional habitat.

AR 13833 (internal citations omitted). This excerpt was included as the penultimate paragraph of a four-page section alleging that the Forest Service had failed to consider "a reasonable range of alternatives" (more specifically, because it had not considered OEC's proposed alternative, the so-called "Optimum Oak Alternative" in great depth). OEC also claims that it had brought this issue to the attention of the Forest Service when it discussed the effects of timber harvest on ectomycorrhizal networks in a supplemental comment during the scoping period, *see* AR 14827– 28, and when it submitted a literature review on the topic, consisting of a ten-page bibliography and 337 pages of studies. *See* AR 11137–47, 11148–485. Both the comment and literature review were referenced in the above-quoted excerpt of OEC's objection to the DDN-FONSI. *See* 36 C.F.R. § 218.8(b) (noting that an objection cannot incorporate documents by reference, except for *inter alia* "[c]omments previously provided to the Forest Service by the objector during public

involvement opportunities for the proposed project where written comments were requested by the responsible official").

This paragraph is not enough, however, to preserve OEC's claim.  It did not reasonably indicate to the Forest Service that the real gravamen of its objection was the ectomycorrhizal argument—and that that was the "adverse impact" the Forest Service needed to address.  After all, the ectomycorrhizal issue comprised just one paragraph of a four-page discussion explaining why OEC believed the Forest Service should have considered the so-called "Optimum Oak Alternative."  OEC could have highlighted its ectomycorrhizal concerns as a separate objection, and not simply as one of many arguments in support of the "reasonable alternatives" objection; it did not do so.  Nor is the argument that it had already clearly flagged the ectomycorrhizal network issue by way of the literature review meritorious.  Simply mentioning its previous comment and literature review does not transform an ancillary argument, to which the Forest Service need not devote a point-by-point response, into a primary objection warranting response.  A failure to raise properly an issue during the Forest Service's mandatory objection process deprives the Forest Service of the opportunity to consider the concern during the administrative process and, therefore, waives judicial review of that issue.  *See Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764 (2004).

Moreover, the Forest Service responded adequately to the ectomycorrhizal issues that OEC properly raised.  During the scoping period, the Forest Service responded to OEC's comment about the impact of ectomycorrhizal networks on "carbon storage and sequestration . . . and [] forest health and resiliency in the face of climate change," AR 14826, by discussing the Project's impact on greenhouse gas emissions.  (*See* Defs.' Cross-Mot. for Summ. J. at 16–17, ECF No. 24) (citing AR 677, 679, 681, 13676).  And later in the administrative process, the Forest Service responded

21

to OEC's objection that it had failed to consider a reasonable range of alternatives (in support of which it mentioned ectomycorrhizal network concerns) and provided reasons for its response; it also explained why OEC's proposed alternative was not analyzed further in detail.  *See* AR 13586–87 (USFS presentation explaining that OEC's proposed alternative fails to promote oak regeneration because oaks are disturbance-dependent whereas OEC's alternative would retain all white oaks without any culling).  This was sufficient to meet its obligation to respond to objections, since that obligation does not require the Forest Service to refute every supporting argument, line-by-line, that OEC mentioned in support of its reasonable range of alternatives objection.  Thus, the Court concludes that OEC's argument that Defendants neglected to consider the adverse impacts of the Project on ectomycorrhizal networks is waived by OEC's failure to raise that issue properly during the mandatory objection process.

OEC's second argument with respect to the "beneficial and adverse" effects factor centers on the Project's potential impact on the white oak population.  Promoting oak regeneration is one of the stated goals of the Sunny Oaks Project, and there was extensive discussion during the administrative process about whether the Forest Service's chosen timber harvest strategies (*i.e.*, clearcutting, shelterwood cutting, etc.) were in alignment with that goal.  OEC, for example, provided a comment during the scoping period and an objection to the EA and DDN-FONSI suggesting that the Project would not regenerate the white oak population but rather lead to the loss of white oaks.  *See, e.g.*, AR 13821.  Thus, OEC's suggestion that "the Project threatens irretrievable loss of the white oaks" does not state an actionable NEPA claim.  (Pl.'s Mot. for Summ. J. at 26, ECF No. 18).  After all, NEPA does not mandate any particular substantive outcome, but rather is a procedure-oriented statute.  Therefore, even if the Sunny Oaks Project would result in the loss of white oaks, the Forest Service would still satisfy its NEPA obligations

22

as long as it had carefully considered this potential adverse impact and arrived at a reasonable conclusion.  Thus, OEC's argument, as the Court understands it, is not that Defendants failed to consider the impact of the Project on white oaks, but rather that their consideration of the issue (and conclusion that it did not warrant further study in the form of an EIS) was arbitrary and capricious.

In other words, OEC argues that the administrative record is replete with evidence that even-aged cutting methods (i.e., all harvest approaches designated for the Sunny Oaks Project) are ineffective at promoting robust white oak regeneration, which the Forest Service ignored in proceeding with even-aged harvests in the Project anyway.  (*See* Pl.'s Mot. for Summ. J. at 26, ECF No. 18).  That evidence was referenced in OEC's scoping period comment, in which it noted that "removing mature white oaks can permanently eliminate [sic] or reduce its spatial footprint in a given stand."  AR 983.  OEC submitted numerous studies in its literature review suggesting that clearcutting can have negative consequences for white oak, *see* AR 10425, that shelterwood cuts result in too much light in the understory whereas white oak regeneration is optimal with light levels below 18%, *see* AR 10425–26, and that white oak regeneration requires sufficient numbers and distribution of large seedlings and saplings in place prior to removal of the overstory.  *See* AR 10427; *see also* AR 10443–831.  OEC suggests that the Forest Service acknowledged that even-aged timber harvests are at cross-purposes with white oak regeneration, when it noted in its response to OEC's objection that "researchers and silviculturists have not identified prescriptions that can consistently regenerate stands that are dominated by white oak, while also creating young, brushy forest."  AR 13678.  And that, according to OEC, demonstrates that the Forest Service's decision to proceed with even-aged harvests in the Sunny Oaks Projects was arbitrary and

capricious in light of the evidence before the agency, given the Project's stated objective of oak regeneration.

But OEC has selectively cited the literature review that it submitted. Although some literature cited by OEC noted the difficulties of promoting oak regeneration through even-aged harvests, other literature suggests that clearcutting can "accelerate[] succession to a mix of shade-tolerant species," which include white oaks, and that thinning (*i.e.*, reducing trees in a stand) sometimes improves acorn production capacity, which is vital for oak regeneration. *See* AR 984. Moreover, as noted earlier, some degree of thinning is not only helpful, but also necessary for white oak regeneration, since saplings require full sunlight to grow to maturity, and full sunlight, in turn, requires a disturbance to the overstory, in the form of cutting mature oaks. *See* AR 13533–34.

In short, it does not appear that the literature is uniformly in support of the proposition that even-aged harvests only have detrimental effects for white oak regeneration. Additionally, the Forest Service carefully discussed this literature and other studies on white oak regeneration in its responses to OEC's scoping comment and DDN-FONSI objection. The Forest Service's responses grappled with the literature cited by OEC, explaining: (1) why it believed that certain studies should be distinguished, *see* AR 13656 (commenting that the Schweitzer and Dey (2011) study did not involve TSI); (2) the ways in which its proposal addressed shortcomings of the actions studied in OEC's proffered literature; and (3) how the occasional removal of some mature white oaks is actually necessary for white oak regeneration. *See* AR 13654–55. The Forest Service also noted that timber harvests are not the primary cause of the decline in white oaks in the Wayne. *See* AR 13654, 13678. And finally, the Forest Service explained that even-aged timber harvesting can promote oak regeneration under the right circumstances.

24

In fact, the timber harvest approach in the Project was modified in an attempt to lessen its potential adverse effects on the white oak population.  *See* AR 13654, 55.  Updated Alternative 2, the final version of the Project, calls for timber stand improvements to be applied to 25,000 acres of forests, which are intended to boost oak regeneration in suitable forest stands that were not designated for harvests; literature in the record explains the benefits of TSI approaches like the use of prescribed fire and herbicides for oak regeneration, which OEC does not appear to dispute.  *See, e.g.*, AR 1222–24, 1596–98.  Updated Alternative 2 also significantly reduced the acreage designated for clearcutting, converted some stands previously designated for clearcutting to two-aged harvests (which retain a partial overstory of mature oaks), and gave the Forest Service flexibility to optimize oak regeneration by monitoring stands for indications of oak regeneration prior to harvest and sequencing harvests—a change intended to ensure that the right conditions are in place for oak regeneration prior to harvesting.  *See* AR 19322–23.  OEC's belief that these changes are insufficient to ensure adequate oak regeneration does not undermine the fact that they were made in response to public concerns about oak regeneration.

The record demonstrates that Defendants considered and carefully evaluated the literature review, comment, and objection submitted by OEC (and other parties) about the potential adverse impact of the Project on the white oak population.  As described above, the Forest Service analyzed and responded to OEC's concerns, adjusted the Project based on those concerns, and included over 25,000 acres of TSI to promote white oak regeneration (in comparison to 2,485 acres of timber harvests).  This engagement with public comments and objections is all that NEPA mandates.  OEC's argument, at its core, is not that Defendants failed to engage with concerns about white oak regeneration, but that Defendants arrived at a different conclusion about how to achieve the regeneration objective.  But once an agency has considered the science, it is not the role of the

court to intervene as a super-scientist, weighing the comparative merits of competing studies and deeming one conclusion or the other better justified by the literature. Rather, the role of the Court is merely to ensure that the agency has carefully considered the potential adverse impacts and addressed public concerns about those impacts in a meaningful and convincing manner. *See Marsh*, 490 U.S. at 377–78; *see also Ohio Valley Env't Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 201 (4th Cir. 2009) (collecting cases). As Defendants have done so here, the Court must defer to the reasonable scientific conclusions of the Forest Service's experts.

        *b.*    *Degree to Which the Action Affects Public Health or Safety*

The second "intensity" factor is the degree to which a proposed action "affects public health or safety." 40 C.F.R. § 1508.27(b)(2). The Forest Service analyzed potential adverse public health effects, including the impacts of the project on air, water, and soil, among other concerns, *see, e.g.*, AR 13396 (finding that the air pollution from the prescribed burns would remain within the Ohio EPA standard); AR 13697–98 (stating that the Project's effects on flood risk and frequency are "completely negligible"), and concluded that the Project will not have any major adverse effects on public health or safety. Additionally, any actions in the Project that might have an adverse effect on public health are subject to mitigation: areas where there will be timber harvests or prescribed burns would be shut down to the public beforehand and the application of herbicides would be carried out by trained professionals. *See* AR 19330.

OEC baldly states that "[t]he Project raises substantial health and safety concerns due to its potential to contribute to existing flood and unstable soil risks, and because of the air pollution that will result from many thousands of acres of authorized prescribed fire." (Pl.'s Mot. for Summ. J. at 28, ECF No. 18) (citing AR 13468). OEC does not provide any further explanation for this assertion. It does not suggest that the Forest Service has failed to take a hard look at flood, unstable

26

soil, or air pollution risks; the Forest Service has clearly considered these risks.  Nor does OEC suggest that the Forest Service's conclusion that the Project does not pose substantial public health or safety risks is unsupported by the analyses the Forest Service prepared.  Accordingly, Defendants' conclusion that this factor does not necessitate, individually or collectively, preparing an EIS is not arbitrary and capricious.

        c.     *Degree to Which the Effects on the Quality of Human Environment are Likely to be Highly Controversial, Highly Uncertain, or Involve Unique or Unknown Risks*

The fourth and fifth factors an agency must consider are the degree to which the effects on the quality of the human environment are likely to be highly controversial, highly uncertain, or involve unique or unknown risks.  *See* 40 C.F.R. §§ 1508.27(b)(4), (5).  The existence of controversy or uncertainty may lead courts to require an EIS, but only if the possible effects are so controversial, so uncertain, or so unique as to "raise substantial questions about the significance of the project's environmental impact."  *Anglers of the Au Sable*, 565 F. Supp. 2d at 827 (citing *Native Ecosystems Council*, 428 F.3d at 1240).  This requires more than "mere public opposition," *id.*, and instead that there be evidence in the record that "casts serious doubt upon the reasonableness of the agency's conclusions."  *Bark v. U.S. Forest Serv.*, 958 F.3d 865, 870 (9th Cir. 2020) (quoting *In Def. of Animals v. U.S. Dep't of Interior*, 751 F.3d 1054, 1069 (9th Cir. 2014)).

But, given the narrow scope of judicial review under the APA, "an agency must have discretion to rely on the reasonable findings of its chosen expert," *Anglers of the Au Sable*, 565 F. Supp. 2d at 827 (citing *Marsh*, 490 U.S. at 377–78), and so an agency action will typically not be deemed arbitrary and capricious where the agency has considered the alleged controversial or uncertain effects and addressed those concerns with a well-reasoned explanation.  *See id.* (internal citations omitted).  A well-reasoned explanation is one that is convincing, *see Nat'l Parks &*

*Conservation Ass'n*, 241 F.3d at 736, explains why more definitive information could not be provided where the presented evidence is uncertain, *see Blue Mountain Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212–13 (9th Cir. 1998), and delves into issues in sufficient depth.

The centerpiece of the Forest Service's approach to the timber harvests in the Sunny Oaks Project is its "adaptive management" plan, which will be applied to all tree stands previously designated for shelterwood cuts—about 1,408 acres of the 2,485 total acres (56.7%) of timber harvests in the Project. In the FDN-FONSI, the Forest Service explained that shelterwood harvests will be implemented as a two-step shelterwood, three-step shelterwood, or TSI followed by clearcut with reserves.[9] AR 19322–23. The Forest Service will determine which of the three options to implement by looking at "stand examination data coupled with best available science and [Forest Service employees'] expertise." AR 19322; *see also* AR 16116–17 (noting, in response to OEC's objection to the DDN-FONSI, that the Forest Service will use adaptive management to apply "treatments that fit conditions"); AR 13571–72 (describing the adaptive management approach for shelterwood cuts as based on "best available science" and "expert judgment"). Stand examinations entail Forest Service employees surveying individual stands in the forest, assessing the size, species, and health of the trees in that stand. *See* AR 13572.

These conditions, in turn, are fed into SILVAH,[10] a computer program created by the Forest Service that recommends how to manage forest stands based on tree data; the prescriptions recommended by SILVAH are not dispositive, however, and are only one factor in the Forest Service's ultimate decision of what harvest approach to take. (*See* Defs.' Cross-Mot. for Summ.

---

[9] The Court limits its consideration to the methodology explained for Updated Alternative 2. OEC's repeated discussions about previous draft methodologies fail to explain why it believes that the current plan for the Project, as embodied in the FDN-FONSI, results in highly controversial or uncertain effects.

[10] SILVAH stands for SILViculture of Allegheny Hardwoods.

J. at 28–29, ECF No. 24) (explaining that the use of SILVAH "is not required, nor is it a replacement for the expertise and management of Forest Service silviculturists," and is not a "substitute for professional judgment" (internal quotation marks and citation omitted)).  Armed with this information, the Forest Service will then implement a two-stage shelterwood if the stand has "enough oak regeneration," or a three-stage shelterwood if the stand has a "need" for an initial preparatory harvest.  *Id.*  The Forest Service will also "monitor implementation of this decision through stocking surveys following harvest," and use the post-harvest data to determine subsequent treatment plans.  *See* AR 13465, 19323.  But the effects of this plan, according to OEC, are "highly uncertain" because the Forest Service has not sufficiently delineated how the different options contemplated by the plan will be chosen.  (*See* Pl.'s Mot. for Summ. J. at 34, ECF No. 18; *see also id.* at 35 (characterizing the "adaptive management" plan as "inappropriately vague and poorly-defined")).

"Adaptive management" approaches are intended to "mitigate the difficulty of predicting the outcome of decisions that must be made based on currently available but incomplete information . . . [by] provid[ing] policymakers with some assurance that they will have the flexibility to respond if their initial assumptions and projections about future resource conditions were misinformed or they were incapable of foreseeing the flow of future events."  Robert L. Glicksman & Jarryd Page, *Adaptive Management and NEPA: How to Reconcile Predictive Assessment in the Face of Uncertainty with Natural Resource Management Flexibility and Success*, 46 HARV. ENV'T L. REV. 121, 125 (2022) (hereinafter "Glicksman & Page"); *see also* 36 C.F.R. § 220.3 (defining "adaptive management" as "[a] system of management practices based on clearly identified intended outcomes and monitoring to determine if management actions are meeting those outcomes; and, if not, to facilitate management changes that will best ensure that

29

those outcomes are met or re-evaluated.  Adaptive management stems from the recognition that knowledge about natural resource systems is sometimes uncertain.").  Adaptive management uses "continual monitoring to find out what works and what does not in a particular management context," which in turn allows policymakers "to modify management strategies to ensure that projects are capable of conforming to statutory or regulatory mandates or policy objectives." Glicksman & Page, *supra*, at 128.  Although this can often be an attractive and useful approach, as it allows agencies to react to changing circumstances, NEPA requires "front-end analytic and public participation requirements . . . [that can] undermine[] adaptive management."  Eric Biber, *Adaptive Management and the Future of Environmental Law*, 46 AKRON L. REV. 933, 937–38 (2013).  After all, adaptive management entails an on-going, iterative process, wherein the policymaker (or agency) monitors a project over time to evaluate its effects and modify the project as necessary.  On the other hand, NEPA asks agencies to forecast the effects of a project ahead of time. *Cf. Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 517 (D.C. Cir. 2010) ("The procedural requirements of NEPA do not force agencies to make detailed, unchangeable mitigation plans for long-term development projects.").

Agencies have grappled with this tension in their regulations and internal guidelines.  The Forest Service, for example, has promulgated regulations requiring that, in an EA, "[a]n adaptive management proposal . . . must clearly identify the adjustment(s) that may be made when monitoring during project implementation indicates that the action is not having its intended effect, or is causing unintended and undesirable effects."  36 C.F.R. § 220.7(b)(2)(iv).  The EA must also "describe the monitoring that would take place to inform the responsible official whether the action is having its intended effect" and "disclose the environmental effects of any adaptive management adjustments." *Id.* § 220.7(b)(2)(iv), (3)(ii).  Additionally, the Forest Service Handbook, which is

a nonbinding document, suggests that the use of adaptive management techniques must be accompanied by specific descriptions of "the outer limits of what is allowed in terms of timing, intensity, frequency, occurrence . . . [to] ensure[] that the environmental analysis clearly identifies the adjustment(s) that may be made when monitoring during project implementation indicates that the action is not having its intended effect."  U.S. FOREST SERV., FOREST SERVICE HANDBOOK § 91.39, https://perma.cc/V8CH-5CYS.

Courts, too, have imposed requirements on adaptive management proposals pursuant to NEPA.  *See* Glicksman & Page, *supra*, at 161–84.  The focus is on requiring agencies to supplement their promises of following adaptive management practices with actual "assurance[s] as to the efficacy of the [] measures" or "a proposal for monitoring how effective 'adaptive management' would be."  *Nat. Res. Def. Council v. U.S. Army Corps of Eng'rs*, 457 F. Supp. 2d 198, 234 (S.D. N.Y. 2006).  In keeping with the spirit of NEPA, courts have typically reviewed agencies' adaptive management proposals with an eye towards the rigor of the procedures outlined in the proposal, rather than the scientific merits of each element of the proposal.  Key procedural elements include overarching performance goals or objectives for the project, "specific quantifiable criteria to evaluate the project's adherence with the adaptive management performance goals," *Theodore Roosevelt Conservation P'ship*, 616 F.3d at 516, monitoring to determine whether the criteria are being met, and mitigation measures to be taken if the criteria are not met.  But courts have not required that these components be set in stone, out of deference to the need for flexibility that is central to adaptive management.  Thus, courts have found explicit guarantees of particular mitigation actions unnecessary, because they are "inconsistent with the notion of 'adaptive management.'"  *Pacific Coast Fed'n of Fishermen's Assocs. v. Blank*, 693 F.3d 1084, 1103 (9th Cir. 2012) (internal citations omitted); *see also Kentuckians for Commonwealth*

31

*v. U.S. Army Corps of Engr's*, 963 F. Supp. 2d 670, 792 (W.D. Ky. 2013).  Similarly, courts have shied away from requiring agencies to specify in advance the mitigation strategies for each individual site in a project, where a case-by-case determination would be more appropriate.  *See Theodore Roosevelt Conservation P'ship*, 616 F.3d at 516.

Instead, courts have placed their trust in agencies' scientific and technical expertise, as long as the agency has spelled out the factors that it will consider in evaluating the effects of its adaptive management plan and making adjustments.  In that vein, courts have approved a Bureau of Land Management ("BLM") adaptive management plan with possible mitigation measures set forth in "a detailed, thirteen-page list of specific protective measures," *Theodore Roosevelt Conservation P'ship*, 616 F.3d at 516, or a different BLM plan that outlined seven measurable performance standards and six possible mitigation measures to be implemented if the criteria for any of the seven performance standards is triggered.  *Powder River Basin Res. Council v. U.S. Bureau of Land Mgmt.*, 37 F. Supp. 3d 59, 81 (D.D.C. 2014); *see also W. Watershed Project v. U.S. Forest Serv.*, 780 F. Supp. 2d 1115, 1120–21 (D. Idaho 2011) (approving a Forest Service proposal that involved the monitoring of "key natural conditions" and detailed the possible consequences of failing to meet the condition criteria).  Additionally, while some degree of flexibility in how agencies respond to unexpected effects is allowable, an agency cannot abdicate entirely its responsibility.  In other words, reliance on an adaptive management strategy "does not provide a justification for postponing altogether the discussion of mitigation measures."  *League to Save Lake Tahoe v. Tahoe Reg'l Plan. Agency*, 739 F. Supp. 2d 1260, 1284 (E.D. Cal. 2010), *aff'd in part, vacated in part on other grounds, remanded*, 469 F. App'x 621 (9th Cir. 2012).  *But see Kentuckians for Commonwealth*, 963 F. Supp. 2d at 692.

32

The  adaptive approach to shelterwood harvests for the Sunny Oaks Project falls short of these requirements.  First, the Project lacks ascertainable criteria for how adaptation decisions will be made.[11]  It is unclear, in other words, what factors will be assessed in assessing the state of "oak regeneration of the correct size."  The simplest possibility, of course, is that the only consideration is the number of young oak trees that have grown to a certain size (*i.e.*, diameter) at 4.5 feet above the ground.  But in the Purpose and Need presentation for the EA, the Forest Service explained that stand examinations assess "the trees growing overhead and how big are they, what species, what health are they in, are they being impacted by insects, those sorts of questions" as well as "what is growing at their feet, what is growing on the forest floor, what species of tree, how many, that sort of thing."  AR 13572.  This suggests that oak regeneration is about more than just the number of young oaks.  The Court has searched in vain, however, for an explanation of which of these factors affect the Forest Service's determination of the adequacy of oak regeneration (or, alternatively, the need for more regeneration)[12]—perhaps all of the factors matter, or only some, or others that are not specified.  The Court is left to speculate.

Nor has the Forest Service explained how it will weigh the relevant factors (whatever they may be) to determine the appropriate implementation method.  The Forest Service has not provided any quantifiable criteria for assessing oak regeneration, either before or after a harvest.  Instead,

---

[11] The focus of the Court's concern here is on criteria for white oak regeneration, though the Court notes that the Forest Service also has not delineated criteria for evaluating whether its efforts to promote young, brushy habitats are successful.  Perhaps the achievement of that goal is more straightforward, given that clearcutting will, presumably, always leave behind an environment for young, brushy forest to grow.

[12] Elsewhere in the same presentation, the Forest Service also provided some indication of when a shelterwood harvest is appropriate as compared to a clearcut harvest; the Forest Service noted that considerations include "adequate numbers of advanced oak seedlings [that] are over 4.5 feet tall and are vigorous and have well-developed root species" and the volume of maple and tulip trees present.  AR 13537.  But this description is not part of the explanation for how the adaptive management approach will be implemented, and is still replete with mentions of vague standards like "adequate" or "vigorous" rather than measurable, action-forcing criteria.

the Project relies on vague quantitative triggers, like "enough" oak regeneration or a "need" for more. But the Forest Service's only explanation for how it will determine what level of regeneration is "enough" to warrant a two-staged shelterwood, what conditions will demonstrate a "need" for a preparatory harvest (and thus for a three-staged shelterwood), or which circumstances show a "need" for regeneration enhancement techniques (*i.e.*, TSI followed by clearcut with reserves ), is that "staff would determine the appropriate treatments based on stand examination data coupled with best available science and their expertise implementing forestry practices." AR 19322–23. But this explanation is unsatisfactory. As an example, assume that the number of oak saplings with a diameter of 3+ inches at 4.5 feet above the ground is an important indicator of the regeneration levels; it would be reasonable to imagine that "enough" regeneration depends on there being a certain number of such trees per acre, or such trees being a certain percentage of all young trees in the stand. So, too, for when there is a "need" for more regeneration. But the Project does not include any quantifiable indicators, instead leaving the definition of "enough," and thus the implementation of the Project, entirely within Defendants' discretion.

By way of contrast, consider the adaptive management plan devised by the BLM for the Fortification Creek Planning Area in Wyoming's Powder River Basin. The plan required monitoring the effects of the authorized development on the local elk population based on the following criteria: "(1) an elk population of 120 or greater; (2) calf production is maintained at least 80% of current cow:calf ratio; (3) winter calf survival is at least 80% of current cow:calf ratio; (4) next-summer calf survival is at least 80% of current cow:yearling ratio; (5) fidelity to the seasonal ranges remains greater than 80% of current levels; (6) security habitat is maintained at 80% or greater than baseline levels within the crucial ranges and yearlong range for each geographic phase; [and] (7) habitat effectiveness is maintained at 80% or greater of current levels

within the crucial ranges and the yearlong range." *Powder River Basin*, 37 F. Supp. 3d at 81 n.8 (internal citation omitted).  Or, consider the Forest Service's implementation of grazing allotments in riparian sites of the Baker Creek area of the Sawtooth National Forest and Sawtooth National Recreation Area, in which it mandated adjustments if the site did not meet predetermined, quantifiable goals like 4 inches of stubble height or less than 20% bank alteration. *W. Watershed Project*, 780 F. Supp. 2d at 1120.

While it is true that numerical criteria are not required in every case, *see Izaak Walton League of Am., Inc. v. Tidwell*, Civil No. 06-3357, 2015 WL 632140, at *20 (D. Minn. Feb. 13, 2015), the criteria must be clear enough to trigger action.  *See also* HOLLY DOREMUS ET AL., CTR. FOR PROGRESSIVE REFORM, MAKING GOOD USE OF ADAPTIVE MANAGEMENT 11 (2011).  That is, the criteria must have enough specificity, in both what it measures and when it is triggered, that the adaptive management approach does not serve simply to postpone an agency's decision-making; rather, it must provide a framework for when and how the agency will act, based on explicit, predetermined conditions.  The numerical criteria outlined in the two examples above are one way, but not the only way, to do so.

But, as it stands, there are no true limits in place on how the shelterwood harvests in the Sunny Oaks Project will be implemented.  As OEC points out, the harvests could be implemented entirely as two-stage shelterwood cuts or entirely as TSI followed by clearcuts with reserves. Although Defendants argue that they have explained their approach in sufficient detail, the explanation is inadequate when there is no objective basis upon which a court could evaluate the Forest Service's implementation of the Project.  Given the inherent ambiguity of a standard like "enough," the Court would have no choice but to accept any determination about the status of regeneration by the Forest Service (if challenged), out of deference to its expertise and judgment

35

on what is "enough" or when there is a "need" for more.  *Cf. Nat. Res. Def. Council v. Kempthorne*, 506 F. Supp. 2d 322, 352 (E.D. Cal. 2007) (finding a Fish and Wildlife Service ("FWS") proposal with "no quantified objectives or required mitigation measures" highly uncertain).  Because Defendants effectively have unlimited discretion in how to implement shelterwood harvests, the possible effects on the human environment of the Sunny Oaks Project are "highly uncertain."

In summary, the Forest Service's adaptive management approach for the Sunny Oaks Project failed to set forth sufficiently specific criteria for determining which harvest option will be chosen for the shelterwood stands and for monitoring and assessing the impacts of the chosen harvest approach on oak regeneration in violation of NEPA.  Accordingly, the Court **GRANTS** OEC's motion for summary judgment as to its NEPA claim and **DENIES** Defendants' motion on that claim.

> d.    *Degree to Which the Action May Establish a Precedent for Future Actions*

OEC argues that the Sunny Oaks Project sets a "major precedent" for future actions, including future timber projects (public and private) in the Wayne, thus satisfying the sixth factor that agencies must consider in weighing whether to prepare an EIS.  *See* 40 C.F.R. § 1508.27(b)(6). But the FDN-FONSI was based upon a "site-specific analysis," AR 19331, and EAs are considered non-precedential.  *Klein*, 753 F.3d at 585; *see also Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124, 1140 (9th Cir. 2011) ("EAs are usually highly specific to the project and the locale, thus creating no binding precedent." (citing *Town of Cave Creek v. Fed. Aviation Admin.*, 325 F.3d 320, 332 (D.C. Cir. 2003))).  And OEC has not identified any private projects that are similar or related, for which the Sunny Oaks Project may serve as a model.  (*See* Pl.'s Mot. for Summ. J. at 34–35, ECF No. 18) (providing no evidence of similar projects).  While Defendants have suggested that other projects will implement SFW-TES-12 in the same manner as the Project, *see infra* Part V.B.1, that

36

is more appropriately characterized as a Forest Plan issue than as a concern with the Project; it is the Forest Service's modified interpretation of the standard that sets a precedent, rather than the Project's implementation of that interpretation.  As such, Defendants' conclusion that the SOP does not establish a precedent for future actions was not arbitrary and capricious.

      *e.*     *Degree to Which the Action May Adversely Affect an Endangered or Threatened Species or Threatens a Violation of Federal, State, or Local Environmental Laws*

The last two intensity criteria in the CEQ regulations are "[t]he degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973" and "[w]hether the action threatens a violation of Federal, State, or local law . . . imposed for the protection of the environment."  40 C.F.R. § 1508.27(b)(9), (10).  FWS prepared a biological opinion ("BiOp") for the Forest Service, in which it concluded that the Project would likely have adverse effects on the federally-endangered Indiana bat, AR 5282, but also that any such effects would be minimal and would not result in "any appreciable reductions in reproduction, numbers, or distribution for Indiana bats range-wide."  AR 5286.  OEC neither mentions nor addresses this BiOp in its motion for summary judgment; instead, OEC's argument about the last two intensity factors focuses on the white oak tree.  (*See* Pl.'s Mot. for Summ. J. at 36–39, ECF No. 18).  But the white oak is not a federally-threatened or endangered species.  In short, there is no indication that the Forest Service's reasonable reliance on the FWS BiOp, in concluding that the Project would not pose major adverse effects on endangered or threatened species, was arbitrary and capricious.

Additionally, OEC alleges that the Project violated SFW-TES-12, one of the standards in the 2006 Forest Plan intended to maintain roosting habitat for the Indiana bat.  The Forest Service considered the impact of the Project on Indiana bat habitats and reasonably concluded that the

impact is minimal, thus obviating SFW-TES-12 concerns with regards to the Indiana bat.  To the extent this argument stands alone as a potential violation of the Forest Service's land management plan, it is discussed in greater detail *infra* with respect to OEC's NFMA claim; for the reasons described more fully below, the Court concludes that the Project does not violate NFMA by unlawfully deviating from SFW-TES-12, and thus that the Project does not "threaten[] a violation of Federal, State, or local environmental law or requirements imposed for the protection of the environment."  40 C.F.R. § 1508.27(b)(10).

### B.        Consistency with the 2006 Forest Plan

OEC suggests that the Forest Service has violated NFMA, because the Sunny Oaks Projects deviates from two components of the 2006 Forest Plan: SFW-TES-12 and GFW-VEG-11.

### 1.        SFW-TES-12

SFW-TES-12 is a two-part standard set forth in the 2006 Forest Plan.  As noted previously, the first part of SFW-TES-12 states:

> With all hardwood timber harvests, retain a minimum of 12 live trees per acre (averaged over the cutting unit) of any species that are six inches or more dbh with large areas of loose bark, unless they pose a safety hazard.[13]

AR 19442.  The emphasis of the standard is on live trees, which poses a complication as live trees tend to have tighter bark.  The second part of the standard states:

> In addition to these, retain live preferred roost trees, when present, to provide a supply of future roost trees (i.e., large, overmature trees).  See Appendix D for list of tree species preferred as roost trees by Indiana bats.  See Table 2-3 for preferred tree sizes. Consult with U. S. Fish and Wildlife Service regarding exceptions that may be needed to minimize adverse effects to other resources or human health and safety.

---

[13] The "six inches or more dbh" component of this definition is intended to ensure that the trees retained pursuant to the standard are of a sufficient maturity, as "dbh" is shorthand for "diameter at breast high" (in effect, the breadth of the tree at 4.5 ft above the ground).

38

*Id.* Although only the second part of the standard mentions Indiana bats explicitly, both parts of the standard are intended to protect the endangered Indiana bat.

As an initial matter, the Court addresses Defendants' contention that OEC waived its NFMA claim by failing to raise the claim in its opening brief. (*See* Defs.' Cross-Mot. at 34, ECF No. 24) (citing Pl.'s Mot. for Summ. J. at 18, ECF No. 37). Although OEC mentions its SFW-TES-12 claim only within its discussion of the NEPA "intensity" factors, *see supra*, it wrote that the Forest Service "deviated from mandatory Forest Plan Standard SFW-TES-12's requirement that Forest Service retain a minimum of 12 live, loose-barked trees per acre in all hardwood timber harvest cutting units as habitat for the federally endangered Indiana bat." (Pl.'s Mot. for Summ. J. at 18, ECF No. 37). The lack of clarity and organization in OEC's brief does not mask the explicit allegation that the Forest Service deviated from SFW-TES-12—in other words, that Defendants violated NFMA. As such, the Court concludes that OEC did not waives its NFMA claim as to SFW-TES-12.

Turning to the merits, Defendants explain that, in the course of implementing the first part of SFW-TES-12, the Forest Service carried out field surveys of nine units within the Wayne (including two in Sunny Oaks) and discovered that the specified trees do not exist in the required quantities in the Wayne, *i.e.*, that there are not 12 live trees with at least six inches dbh and large areas of loose bark per acre. AR 5621. This is because "most live trees do not inherently possess large areas of loose bark," which "is a characteristic of dead or dying trees or large-diameter dead branches of forks." *Id.* Instead, in the tree stands within the Sunny Oaks Project, there were on average only about six trees per acre with large areas of loose bark. (*See* Pl.'s Reply Br. at 15, ECF No. 37 (citing AR 5642); Defs.' Reply Br. at 13, ECF No. 38 (citing AR 5634–35, 37)).

In the absence of sufficient numbers of such trees, the Forest Service concluded that it could not meet the first part of the SFW-TES-12 standard.[14]  The Forest Service found that the majority of live trees with more than six inches dbh and large areas of live bark are shagbark and shellbark hickory trees, which are already required to be retained under GFW-TES-9, another guideline in the 2006 Forest Plan.  (Defs.' Reply Br. at 15–16, ECF No. 38) (citing AR 5622, 21954).  Based on that information, the Forest Service interpreted the first part of SFW-TES-12, in light of the standard's purpose of protecting and conserving roosting habitat, such that it is satisfied by the retention of the shagbark and shellbark hickories.  *Cherokee Forest Voices v. U.S. Forest Serv.*, 182 F. App'x 488, 494 (6th Cir. 2006) ("Substantial deference is due to the Forest Service's interpretation of a Forest Plan." (quoting *Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089, 1098 (9th Cir. 2003))); *see also Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1056 (9th Cir. 2012).  Moreover, because only one of the 152 Indiana bat roost trees identified by the FWS in its survey was a live white oak, AR 21054, specifically retaining white oaks (in addition to shagbark and shellbark hickories) would make minimal difference to the number of Indiana bat roosting trees in the Wayne.

None of OEC's contentions disputes the Forest Service's authority to interpret its own standards or guidelines.  Instead, OEC questions the survey data provided by the Forest Service, repeatedly arguing that it must be wrong because "white oak trees are well-known for their loose

---

[14] OEC focuses on the fact that, in its analysis of the implementation of the standards and guidelines in the 2006 Forest Plan that relate to Indiana bat habitats (which include SFW-TES-12), the Forest Service wrote that the "first part of SFW-TES-12 is not possible to meet in average forest conditions on the Wayne, thus, nullifying this requirement."  AR 5616.  Defendants acknowledge that the word choice of "nullify" was inappropriate, but note that, under the APA, a reviewing court must give some leeway to an agency's lack of clarity.  (*See* Defs.' Reply at 16, ECF No. 38) (citing *Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*, 957 F.3d 1024, 1035 (9th Cir. 2020)).

OEC also appears to misunderstand Defendants' conclusion "that the first part of the standard does not exist in nature and thus cannot be met" as indicating that "loose-barked trees do not exist in nature."  (Pl.'s Reply Br. at 15, ECF No. 37) (quoting AR 5607).  This is plainly incorrect.  The Forest Service concluded that 12 live trees with large areas of loose bark did not exist; it did not conclude that there are no live trees with large areas of loose bark.

bark," based on literature describing white oaks as trees with loose bark and as roosting habitats for Indiana bats.  (Pl.'s Mot. for Summ. J. at 37, ECF No. 18) (citing AR 5621, 21795).  But while it may be true that white oaks often have loose bark, that does not contradict the actual survey data compiled by trained Forest Service professionals in the field showing that, at least in the surveyed areas of the Wayne, white oaks did not display these characteristics.  OEC also critiques the Forest Service's decision not to mark retention trees outside of riparian corridors, arguing that in doing so "Defendants decided that they would not even try to satisfy the loose-barked tree retention requirements of FWS-TES-12 [sic]."  (*See* Pl.'s Reply Br. at 15, ECF No. 37).  This argument appears to misunderstand the standard.  The non-marking of trees relates to the second part of SFW-TES-12, which requires the retention of nine future roost trees per acre, *see* AR 19442, rather than to the first part of the standard.  The Forest Service determined that future roost trees are so abundant in areas of the Project that are not subject to harvesting, including riparian filter strips and flight corridors, that the second part of SFW-TES-12 will be easily met, thus obviating the need to mark individual trees for retention.  (*See* Defs.' Reply Br. at 14, ECF No. 38) (citing AR 5619–20, 5624–28).  OEC fails to acknowledge the distinction between the two parts of SFW-TES-12; its argument here about the Forest Service's actions with respect to the second part of SFW-TES-12 mistakenly alleges a violation of the first part, which is inapplicable.  (*See* Pl.'s Reply Br. at 15, ECF No. 37).

In light of the facts on the ground and the intent of the standard, Defendants' decision to interpret SFW-TES-12 to require fewer than 12 live trees with large areas of loose bark and to structure the Sunny Oaks Project in conformity with that interpretation was not arbitrary and capricious.

*2.* *GFW-VEG-11*

Guideline GFW-VEG-11 states that any two-aged harvests in the Wayne should "leave approximately 15 to 30 square feet of basal area per acre uncut." AR 19447. In the FDN-FONSI, the Forest Service explained that it did not consider OEC's proposed alternative—keeping all mature, acorn-producing white oaks—because oak regeneration "would be suppressed if more than 15 square feet of basal area is kept over the long-term." AR 13472. This, according to OEC, violates GFW-VEG-11, because it indicates that the Project will retain as little as 0 square feet of basal area, instead of "approximately 15 to 30 square feet." (Pl.'s Reply Br. at 16, ECF No. 37). This claim was first raised in OEC's combined reply and response to Defendants' summary judgment motion, and later added to the complaint upon leave to amend.

In allowing amendment to the complaint, the Magistrate Judge considered Defendants' futility argument in the context of administrative law generally, but not within the more specialized context of NEPA and Forest Service regulations. (*See* Order at 6, ECF No. 44). As noted earlier, Forest Service regulations require that public commenters exhaust all administrative appeals before filing suit in federal court, which entails objecting to the EA and DDN-FONSI during the specified period and detailing the specific issues the commenter has identified with the project. *See* 36 C.F.R. §§ 218.1–.16. OEC has not done so here, despite its various arguments otherwise.

It is not the case, as OEC alleges, that the Forest Service failed to disclose their intent to retain only 15 square feet of basal area in the Sunny Oaks Project until rejecting OEC's proposed alternative in the FDN-FONSI on that basis. (*See* Pl.'s Reply Br. at 6, ECF No. 42) (citing *All. for the Wild Rockies v. Savage*, 897 F.3d 1025, 1034 (9th Cir. 2018)). In fact, the Forest Service had already rejected OEC's proposed alternative in the DDN-FONSI for the exact same basis, thus alerting OEC to the alleged issue at that stage. *See* AR 13425; *see also* AR 13420. OEC, however,

42

did not raise the GFW-VEG-11 issue in its objection to the DDN-FONSI.  Nor is this a case where the flaw was so obvious as to negate the need for objection.  (*See* Pl.'s Reply Br. at 6, ECF No. 42) (citing *Pub. Citizen*, 541 U.S. at 765; *Friends of Tims Ford*, 585 F.3d at 964).  OEC alleges that the Forest Service may retain "as little as zero" square feet of basal area, which would likely violate GFW-VEG-11's requirement of retaining "approximately 15 to 30 square feet" of basal area; but this is neither a required nor obvious reading of the Forest Service's plan to retain a "maximum of 15 square feet" of basal area—and certainly not so obvious a reading that the normal procedures of administrative law are waived.

Finally, nowhere in OEC's comment or objection did it allege that the Sunny Oaks Project would deviate from GFW-VEG-11 or improperly require a maximum retention of 15 square feet of basal area.  OEC claims that it objected in one of two possible ways.  First, OEC appears to suggest that its arguments alleging that the Project deviated from SFW-TES-12 brought the GFW-VES-11 issue to Defendants' attention.  (*See* Pl.'s Reply Br. at 5, ECF No. 40).  But while both relate to the protection of Indiana bat roosting habitat, they set out different objectives; objecting to one does not inherently implicate the other.  Second, OEC states that, in its objection to the DDN-FONSI, "it objected that Forest Service failed to adequately explain its 15 square foot retention maximum rationale."  (*Id.*) (citing AR 13832–33).  In fact, OEC's objection was focused on disputing the scientific rationale, rather than the legal or regulatory problem, of the Forest Service's decision, *see* AR 13833, and falls far short of explaining "how the objector believes the [EA] specifically violates law, regulation, or policy."  36 C.F.R. § 218.8(d)(5).  OEC's attempt at claiming that this one-line objection "alert[ed] the decision maker to the problem in general terms" is unavailing where it provided no indication that there was an issue of consistency with the 2006

Forest Plan's guidelines.  (Pl.'s Reply Br. at 6, ECF No. 40) (quoting *Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 965–66 (9th Cir. 2002)).

OEC's failure to raise its GFW-VEG-11 claim until its combined response to Defendants' cross-motion for summary judgment and reply in support of its own summary judgment motion has waived the claim.  Accordingly, OEC's NFMA claim is **DENIED**.

## C.    Remedy

 Lastly, the Court turns to the issue of the appropriate remedy for the Forest Service's violation of NEPA.  In OEC's Second Amended Complaint, it asks *inter alia* that the Court set aside the Forest Service's FDN-FONSI and EA for the Sunny Oaks Project and enjoin the Forest Service and any contractors, assigns, and other agents from engaging in timber harvests until the alleged violations of federal environmental laws have been corrected; it also asks that the Court order the Forest Service to prepare an EIS and revise the Project to comply with NFMA and the 2006 Forest Plan.  (Second Am. Compl. at 38–39, ECF No. 45).

As neither party has fully briefed the issue of remedies, and in fact do not discuss remedies in their summary judgment briefs, the Court finds that additional briefing on remedies is the most prudent course of action to take.  *See, e.g.*, *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 444 F. Supp. 3d 832, 872 (S.D. Ohio 2020).  The supplemental briefing should address what standard applies, whether vacatur of the Forest Service's EA and FONSI for the Sunny Oaks Project is appropriate, and the applicability or inapplicability of other remedies.  The briefing should also address the range of remedies that the parties deem appropriate for this case, in light of the Court's discretion to craft an equitable remedy somewhere within the spectrum between vacatur and remand without vacatur if the circumstances so require.  *See, e.g.*, *WildEarth Guardians v. Zinke*,

368 F. Supp. 3d 41, 85 (D.D.C. 2019).  Each brief should be limited to a maximum of twenty (20) pages.  The briefing schedule shall be as follows:

1.      Plaintiff shall file its briefing on remedies within **twenty-one (21) days** of the date of this Order;

2.      Defendants shall file their response within **fourteen (14) days** thereafter; and

3.      Plaintiff may file a reply within **seven (7) days** of Defendants' response.

## VI.      CONCLUSION

For the reasons stated more fully above, this Court **GRANTS IN PART and DENIES IN PART** OEC's motion (ECF No. 18) and **GRANTS IN PART and DENIES IN PART** Defendants' motion (ECF No. 24).

**IT IS SO ORDERED.**

**ALGENON L. MARBLEY**
**CHIEF UNITED STATES DISTRICT JUDGE**

**DATE:  March 30, 2023**