NATHAN G. JOHNSON (OH State Bar No.0082838)
Ohio Environmental Council
1145 Chesapeake Avenue, Suite I
Columbus, OH 43212
Tel: 614-487-5841
njohnson@theoec.org

*Counsel for Plaintiff OEC*

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| **OHIO ENVIRONMENTAL COUNCIL**, | ) | Case No. 2:21-cv-4380-ALM-KAJ |
| | ) | |
| Plaintiff, | ) | Chief Judge Algenon L. Marbley |
| | ) | Magistrate Judge Kimberly A. Jolson |
| vs. | ) | |
| | ) | |
| **U.S. FOREST SERVICE**, et al., | ) | **PLAINTIFF'S SUPPLEMENTAL BRIEF** |
| | ) | **ON REMEDIES** |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

## INTRODUCTION

Plaintiff begins this supplemental brief on remedies by returning to the core holding contained in the Court's merits ruling. In its March 30, 2023 Opinion and Order, the Court granted Plaintiff's motion for summary judgment on its NEPA claim. *Ohio Env't Council*, 2023 U.S. Dist. LEXIS 56032 at \*54 (ECF 50 at DocID 2285). In the words of the Court, Plaintiff's claim "allege[d] that Defendants violated NEPA because their decision to issue a FONSI and not prepare an EIS was arbitrary and capricious." *Id*. at \*21. In short, whether Forest Service is required to prepare an EIS for the SOP is a settled question. The Court has ruled in Plaintiff's favor on this claim. Defendants are required to prepare an EIS.

And, indeed, the question of whether Forest Service was required to prepare an EIS is precisely how Defendants cast this claim in their cross-motion for summary judgment, which the Court denied: "The test is […] whether the Forest Service 'acted arbitrarily and capriciously in not completing [an EIS].'" (ECF 24 DocID 1916) ("[an EIS]" wording is Defendants') (quoting *Klein v. U.S. Dep't of Energy*, 753 F.3d 576, 584 (6th Cir. 2014)). Plaintiff satisfied the "test," in the words of Defendants, and the Court granted its claim: Forest Service violated NEPA by failing to complete an EIS for the SOP.

As this Court noted in its Opinion and Order of March 30, 2023, "an EIS is *required* where a plaintiff can show 'substantial questions whether [the] project may have a significant effect.'" 2023 U.S. Dist. LEXIS 56032 at *21-22 (emphasis added) (quoting *Klamath-Siskiyou Wildlands Ctr. v. Boody*, 468 F.3d 549, 562 (9th Cir. 2006)). The *Klamath-Siskiyou* court, in turn, further explained the substantial questions standard by noting that "[t]he plaintiff need not show that significant effects *will in fact occur*, but if the plaintiff raises substantial questions whether a project may have a significant effect, an EIS must be prepared." *Klamath-Siskiyou*, 468 F.3d at 562 (quoting *Idaho Sporting Congress v. Thomas*, 137 F.3d 1146, 1150 (9th Cir. 1998) (emphasis in original). Furthermore, the *Klamath* court noted that "[t]his is a low standard." *Id*.

Plaintiff has amply satisfied the low standard of raising substantial questions about whether the SOP may have significant effects. As this Court held in its merits Opinion and Order, "the possible effects on the human environment of the Sunny Oaks Project are 'highly uncertain.'" *Ohio Env't Council*, 2023 U.S. Dist. LEXIS 56032 at *54. And, the highly uncertain nature of the SOP's effects satisfies the "substantial questions" standard. *Anglers of the Au Sable v. United States Forest Serv.*, 565 F. Supp. 2d 812, 830-31 (E.D. Mich. 2008) (finding project's

*uncertainty* required an EIS where "accumulation of numerous vague, conclusory, and incomplete analyses" raised "'substantial questions' about the possible significance of the project's impact."). In fact, the Congressional intent behind the EIS process was to address uncertain situations like those presented by the Sunny Oaks Project. "Congress created the EIS process to provide robust information in situations . . . where, following an environmental assessment, the scope of a project's impacts remains both uncertain and controversial." *Standing Rock Sioux Tribe v. United States Army Corps of Eng'rs*, 985 F.3d 1032, 1043 (2021) (quoting *Nat'l Parks Conservation Ass'n v. Semonite*, 422 F. Supp. 3d 92, 1087-88 (D.D.C. 2019)).

Even apart from the substantial questions inquiry, the presence of highly uncertain effects generally requires the preparation of an EIS. "An agency must generally prepare an EIS if the environmental effects of a proposed agency action are highly uncertain." *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 731 (9th Cir. 2001) (holding uncertainty of effects required National Park Service required to prepare EIS before authorizing more cruise ships to enter Glacier Bay National Park). "An EIS is […] warranted when the possible effects of the proposed action are 'highly uncertain or involve unique or unknown risks.'" *Envtl. Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 880 (9th Cir. 2022) (vacating EA and holding that an EIS was required given unknown toxicity risks posed by well stimulation treatments and significant data gaps). *See also Bark v. United States Forest Serv.*, 958 F.3d 865, 871 (9th Cir. 2020) (requiring preparation of an EIS where the effects of the logging project were highly controversial and uncertain). *Cf. Ctr. for Biological Diversity v. United States Forest Serv.*, 444 F. Supp. 3d 832, 871 (S.D. Ohio 2020) (declining to find that an EIS was required where, unlike here, court was "not convinced" that intensity factors were met."). As discussed below, the Court's merits ruling will factor into the consideration of remedies.

**ARGUMENT**

I.     **The Court Should Apply the Presumptive Remedy and Vacate the FDN-FONSI and Final EA.**

The Administrative Procedure Act ("APA") creates a presumption of vacatur if an agency acts unlawfully. The reviewing court shall "hold unlawful and set aside" arbitrary, capricious and illegal agency action. 5 U.S.C. § 706(2). "The presumptive remedy for violations of NEPA and the Administrative Procedure Act is vacatur." *350 Montana v. Haaland*, 29 F.4th 1158, 1164 (9th Cir. 2022) (citing 5 U.S.C. § 706(2)(A)); *see also All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1121 (9th Cir. 2018) ("vacatur of an unlawful agency action normally accompanies a remand"). Courts may decline to vacate an unlawful agency action as a matter of equity in "rare" or "limited" circumstances. *Coal. to Protect Puget Sound Habitat*, 466 F. Supp. 3d at 1219; *see also 350 Montana*, 29 F.4th at 1117 (Ninth Circuit orders remand without vacatur "only in limited circumstances"). This case does not present the sort of rare or limited circumstance that might entail remand without vacatur. Applying the presumptive remedy here, this Court should vacate and set aside the Decision Notice, FONSI, and Final EA and remand the matter to the Forest Service to comply fully with NEPA, the APA, and this Court's Order. *See California Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1095 (9th Cir. 2011) ("When a court determines that an agency's action failed to follow Congress's clear mandate the appropriate remedy is to vacate that action.").

Because the APA creates a "presumption of vacatur" if an agency acts unlawfully, the party seeking exception to the vacatur rule bears the burden of demonstrating that equity demands remand without vacatur. *All. for the Wild Rockies v. United States Forest Serv.*, 907 F.3d 1105, 121-22 (9th Cir. 2018) (noting remand without vacatur allowed "[w]hen equity demands"); *Nat'l Parks Conservation Ass'n v. Semonite*, 422 F. Supp. 3d 92, 99 (D.D.C. 2019)

("Because vacatur is the default remedy, plaintiffs are correct that defendants bear the burden to prove that vacatur is unnecessary."); *Coal. to Protect Puget Sound Habitat v. United States Army Corps. of Eng'rs*, 466 F. Supp. 3d 1217, 1226 (W.D. Wash. 2020) ("The burden is on the parties opposing invalidation of unlawful agency action to rebut the APA's 'presumption of vacatur' by showing that the equities demand remand without vacatur.")

The Forest Service must carry its burden to demonstrate why the presumptive remedy of vacatur would not apply here where this Court identified a serious flaw with the Forest Service's NEPA and APA compliance. Absent that showing (along with a showing of seriously disruptive consequences of vacatur, *infra*), this Court should apply the presumptive remedy under NEPA and the APA and vacate the Forest Service's DN, FONSI, and EA and remand to the Forest Service to prepare an EIS.

When determining whether remand without vacatur is necessary, courts in several circuits apply the *Allied-Signal* test, which sets forth two factors for courts to consider. *Allied-Signal v. United States Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (1993). The Sixth Circuit very recently applied *Allied-Signal* for the first time. *Sierra Club v. United States EPA*, 60 F.4th 1008, 1022-23 (6th Cir. 2023). The test has two factors: "In general, whether vacatur is appropriate depends 'on the seriousness of the agency error and the disruptive consequences of vacatur.'" *Id.* at 1022. (citations omitted). In addition, "[n]either *Allied-Signal* factor is dispositive; rather, 'resolution of the question turns on the [c]ourt's assessment of the overall equities and practicality of the alternatives.'" *Id.* (citations omitted). That said, the "seriousness" of a deficiency "is determined at least in part by whether there is a 'significant possibility that the [agency] may find an adequate explanation for its actions' on remand." *Standing Rock Sioux Tribe v. United States Army Corps of Eng'rs*, 450 U.S. App. D.C. 503, 985 F.3d 1032, 1051

(2021) (quoting *Allied-Signal*). And, "Under the second *Allied-Signal* factor, vacatur may not be warranted if it would lead to serious, disruptive consequences." *Nat'l Parks Conservation Ass'n v. Semonite*, 422 F. Supp. 3d 92, 100 (D.D.C. 2019). Defendants will not be able to meet the burden of either *Allied-Signal* factor in this case.

**II.     This Case Does Not Present the Rare or Limited Circumstances that Warrant Withholding Vacatur.**

Withholding vacatur is not appropriate in this case because: (1) the Forest Service's NEPA violation is serious and not readily curable, and (2) vacatur would not lead to serious disruptive consequences. To remedy the Forest Service's serious violations of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332, and the Administrative Procedure Act (APA), 5 U.S.C. § 706, the Court should therefore apply the presumptive remedy of vacatur and remand with instructions to prepare an EIS.[1]

**A.  The Forest Service committed a serious violation that is not readily curable.**

On remand, Forest Service would not be able to readily correct the highly uncertain nature of the SOP's effects, its arbitrary and capricious FONSI, or its failure to produce an EIS. Defendants' serious NEPA process violation lies in the very "centerpiece" of the Sunny Oaks Project – the Project's "adaptive approach" to timber harvests. And, it is not just the FDN-FONSI that lacks ascertainable criteria for the Sunny Oaks Project's timber objectives. The EA, too, is devoid of such criteria. Furthermore, this Court has already granted Plaintiff's claim that Defendants violated NEPA by preparing a FONSI when an EIS was required. This is dispositive on the question of whether the agency can readily correct its error on remand: it cannot. When

---

[1] Even if for some reason the Court does not grant vacatur, it should still remand with an order that Forest Service perform an EIS. *Nat'l Parks Conservation Ass'n v. Semonite*, 422 F. Supp. 3d 92 (D.D.C. 2019) (noting that, even where it denied vacatur due to severe disruptive consequences of rolling blackouts and tens of millions of dollars in sunk costs, the agency "cannot substantiate its initial procedural decision to forgo an EIS, as the D.C. Circuit has already found that such a decision would violate NEPA.").

determining whether an agency can easily correct a NEPA error, courts look not to the underlying substantive decision of the project or rulemaking at issue, but to the deficiency in the agency's NEPA process. *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, 985 F.3d 1032, 1053 (D.C. Cir. 2021) ("Looking at the first *Allied-Signal* factor, the Court does not assess the deficiency of the ultimate decision itself—the choice to issue the permit—but rather *the deficiency of the determination that an EIS was not warranted*.") (emphasis in original) (quoting and endorsing the district court's determination). The Court has already decided this issue.

Some courts have held that a NEPA defect may not be serious for *Allied-Signal* purposes where the defect may be readily cured on remand. *See Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 198 (D.C. Cir. 2009). But an arbitrary and capricious FONSI and failure to prepare an EIS where one is required has been recognized as a categorically serious error. *Standing Rock Sioux Tribe v. United States Army Corps of Eng'rs*, 471 F. Supp. 3d 71, 81 (D.D.C. 2020) ("To the extent that Defendants complain that the 'seriousness' of an agency's failure to produce an EIS under NEPA is a foregone conclusion, they are taking issue with the caselaw in this Circuit[.]"); *See Env'tl Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 882 (9th Cir. 2022) (vacating EA and remanding with instructions to issue EIS where highly uncertain effects and unknown risks intensity factor was triggered).

Furthermore, NEPA violations are serious notwithstanding an agency's argument that it might ultimately be able to justify the substance of the challenged action. *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, 985 F.3d 1032, 1053 (D.C. Cir. 2021) ("where an EIS was required but not prepared, courts should harbor substantial doubt that 'the agency chose correctly' regarding the substantive action at issue."), *cert. denied sub nom. Dakota Access, LLC v. Standing Rock Sioux Tribe*, 142 S. Ct. 1187 (2022); *see also Ctr. for Biological Diversity*, 982

F.3d at 738-40, 751 (vacating agency decision based on arbitrary and capricious calculation of greenhouse gas emissions under NEPA even where the agency could potentially correct its errors with further analysis or explanation).

Moreover, Forest Service's NEPA violations permeate the SOP and are not of limited nature or scope. This is not the sort of superficial or cabined violation that lends itself to a ready cure on remand. Quite the opposite. As this Court noted in its merits opinion and order, the "centerpiece of the Forest Service's approach to timber harvests in the Sunny Oaks Project is its 'adaptive management' plan." *Ohio Env't Council*, 2023 U.S. Dist. LEXIS 56032 at \*42 (S.D. Ohio Mar. 30, 2023). It is this "centerpiece" of the SOP that the Court has already found renders the Project's effects "highly uncertain" and upon which this court granted Plaintiff's NEPA claim. *Id*. at \*54. This is a serious and wide-reaching violation by any measure. As the Court notes, the adaptive approach fails to even provide or disclose oak regeneration relevant factors. *Id*. at \*49. Nor did Forest Service even explain "how it will weigh the relevant factors (whatever they may be) to determine the appropriate implementation method." *Id*. at \*50. Forest Service provided "no objective basis upon which a court could evaluate the Forest Service's implementation of the Project." *Id*. at \*53. This black hole of deficiency at the very core of the Project simply does not fit the mold of NEPA oversights that are readily cured on remand. *Cf. All. for the Wild Rockies v. Savage*, 375 F. Supp. 3d 1152, 1155-56 (D. Mont. 2019) (remanding without vacatur because the flaw in Forest Service's analysis was "limited in scope").

Defendants may wish to cite *Ctr. for Biological Diversity v. United States Forest Serv.*, 444 F. Supp. 3d 832 (S.D. Ohio 2020) for the proposition that remand without vacatur is warranted here. But, *Ctr. for Biological Diversity* is readily distinguished. In addition to major differences in the second *Allied-Signal* prong on disruptive consequences, discussed *infra*, the

district court there was not convinced that any NEPA intensity factors were met. *Id*. at 871. The court therefore declined to find that an EIS was required. *Id. WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41 (D.D.C. 2019) is also readily distinguished. The court there found that the agency had largely complied with NEPA. *Id*. at 84. The one exception being that the agency had failed to sufficiently develop the issue of greenhouse gas emission impacts – such that the court found itself unable to rule on whether the project triggered the cumulative effects intensity factor. *Id*. at 81. Moreover, the *Zinke* court held that the effects of the project were *not* highly uncertain. *Id*. at 82-83. By contrast, this Court has already ruled on the merits that the potential effects of the SOP *are* highly uncertain. *Ohio Env't Council*, 2023 U.S. Dist. LEXIS 56032 at *54.

Another readily distinguishable case is *Standing Rock Sioux Tribe v. United States Army Corps of Eng'rs*, 255 F. Supp. 3d 101, 129 (June 14, D.D.C. 2017). There, the agency was presented with scientific reports after it had already finalized the EA for an interstate oil pipeline project. In that case, the district court found that the reports might possibly create controversy, but that the agency had totally failed to address them. *Id.* As a result, the court declined to rule that the effects of the project were highly controversial. *Id*. Instead, the court stated that there was reason to believe the expert reports might be flawed, and remanded to the agency to offer its explanation as to why the reports did not render the project highly controversial. *Id*. Here, by contrast, the Court has already found that the SOP's effects *are* highly uncertain. *Ohio Env't Council*, 2023 U.S. Dist. LEXIS 56032 at *54.

By authorizing the SOP's oak regeneration cuts without disclosing their impacts and without articulating a meaningful adaptive management strategy, the Forest Service's NEPA violation contravenes NEPA's informed and transparent decisionmaking mandate and warrants vacatur. "[B]ecause NEPA is a 'purely procedural statute,' where an agency's NEPA review

suffers from 'a significant deficiency,' refusing to vacate the corresponding agency action would 'vitiate' the statute." *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, 985 F.3d 1032, 1052-53 (D.C. Cir. 2021) (quoting *Oglala Sioux Tribe v. U.S. Nuclear Regulatory Commission*, 896 F.3d 520, 536 (D.C. Cir. 2018). Forest Service's procedural NEPA violation is serious, in part, because it deprives the agency of an adequate informational framework for analysis and decisionmaking. The Forest Service's unlawful environmental review also deprives the public of information necessary for it to "play a role in both the decisionmaking process and the implementation of that decision." *Robertson v. Methow Valley Cit. Council*, 490 U.S. 332, 349 (1989).

Allowing the Forest Service to proceed with SOP activities prior to completing environmental review would do great damage to NEPA's purpose. A ruling of that nature would relegate NEPA's environmental analysis to a mere paperwork exercise, with no real-world consequences for failing to comply. "Congress did not intend [NEPA to be] a paper tiger. Indeed, the requirement of environmental consideration 'to the fullest extent possible' sets a high standard for the agencies, a standard which must be rigorously enforced by the reviewing courts." *Calvert Cliffs' Coordinating Comm., Inc. v. U. S. Atomic Energy Comm'n*, 449 F.2d 1109, 1114 (D.C. Cir. 1971). Similarly, allowing Forest Service to proceed with the SOP, even after the SOP has been invalidated by this Court, would invite Forest Service to engage in a process of post hoc rationalization on remand. With SOP cutting, burning, spraying, and bulldozing either proceeding or poised to proceed, Forest Service would have a strong incentive to draft an EIS that justifies its earlier decision, rather than objectively analyze and meaningfully disclose an adaptive management framework and associated project impacts. *See Sierra Club v. Marsh*, 872 F.2d 497, 504 (1st Cir. 1989) (Breyer, J.) ("[t]he difficulty of stopping a bureaucratic

steam roller, once started, [] seems to us, . . . a perfectly proper factor for a district court to take into account[.]"). On the other hand, a NEPA review process unburdened by the freight of an invalid SOP EA and DN-FONSI could lead the Forest Service to, among other things, adopt a different alternative. As the Supreme Court has explained, detailed environmental review under NEPA is "almost certain to affect the agency's substantive decision" even if NEPA does not mandate particular results. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348-50 (1989).

Defendants' violations of NEPA and the APA are serious. These violations are not readily curable on remand. And, indeed, whether Defendants' procedural NEPA violation is curable on remand has already been settled in the negative on the merits. The Court should therefore apply the standard remedy of vacatur.

### B. Vacatur will not result in serious disruptive consequences.

The Forest Service bears the burden of showing that its serious NEPA violations are significantly outweighed by the disruptive consequences of vacatur. "[C]ourts may decline to vacate agency decisions when vacatur would cause serious and irremediable harms that significantly outweigh the magnitude of the agency's error." *Coal. to Protect Puget Sound Habitat*, 466 F. Supp. 3d at 1219 (quoting *AquAlliance v. U.S. Bureau of Reclamation*, 312 F. Supp. 3d 878, 881 (E.D. Cal. 2018)). "Under the second *Allied-Signal* factor, vacatur may not be warranted if it would lead to serious, disruptive consequences." *Nat'l Parks Conservation Ass'n v. Semonite*, 422 F. Supp. 3d 92, 100 (D.D.C. 2019). That said, even where vacatur will have disruptive consequences, courts have applied vacatur. *See, e.g., Se. Alaska Conservation Council v. United States Forest Serv.*, 468 F. Supp. 3d 1148, 1152 (D. Alaska 2020) ("[T]he Court finds

that the economic harm caused by partial vacatur of the Project EIS does not outweigh the seriousness of the errors in that document, such that remand without vacatur is appropriate.").

Defendants may wish to argue that vacatur would be disruptive given a supposed lack of "early successional habitat." But the court should see through such arguments. There is a large and steady supply of brushy clearcuts on private lands that surround and intersect the Wayne's highly fragmented boundaries. *See, e.g.*, the 2005 Biological Opinion for the Wayne's Forest Plan: "Based on knowledge gained by WNF staff, about 50% of the private lands in the Ironton District have been logged over the past 20 years." AR 20546; AR 9727 (satellite image showing large clearcut on private land immediately adjacent to the Wayne and Kenton Lake); AR 57 (map depicting recent project-adjacent timbering on private lands). By contrast, "Emphasis on clearcutting was substantially curtailed after 1990 and no clearcutting at all has occurred on the Wayne since 1994." 2005 Biological Opinion at AR 20549. Likely not by coincidence, there are more than twice as many white oaks per acre on the Wayne than on surrounding private lands. *See* AR 5631. This page in the record displays Forest Service data showing, on average, 6.9 white oaks per acre in the Wayne versus 3.2 white oaks per acre on private lands in southeast Ohio. *Id.* (note, too, the 1.3 shagbark hickories per acre average on both the Wayne and private lands).

Perhaps Defendants will also argue that vacatur would be highly disruptive to their goal of maintaining oak forests. But, the highly uncertain nature of the Project's effects should foreclose that line of argument. At any rate, the oak trees in the project area are not likely to up and leave *en masse* any time in the near future. And, after all, Forest Service's own scientists emphasize – quite rightly – that "patience is required in restoring oak-hickory." AR 10436.

Leaving the SOP in place risks more potential environmental harm than vacating it. In addition to its clearcuts, two-aged cuts, and "shelterwoods," the Sunny Oaks Project authorizes an unspecified amount of thinning cuts throughout the project area. AR 13468. The SOP also authorizes between 2,000 to 4,000 acres of prescribed burning per year. *Id*. The SOP authorizes the bulldozing of 23 miles of fire line through the project area each year. *Id*. And, the Project authorizes an unspecified amount of herbicide applications throughout the project area. *Id*. *Pollinator Stewardship Council v. United States EPA*, 806 F.3d 520, 532 (9th Cir. 2015) (vacating an insecticide registration and remanding to the agency was appropriate because leaving the registration in place risked more potential environmental harm than vacating it, given the precariousness of bee populations).

Defendants may also wish to argue that potential economic effects of vacatur would be seriously disruptive. But that sort of argument should get no traction with this Court. See, for example, the SOP's "Economic Efficiency Analysis, Updated," which estimates the costs of building taxpayer-funded logging roads throughout the project area as exceeding the total timber value of the SOP by more than $1,705,000. AR 6045 ("Economic Summary" tab at line 82, Columns H and J, showing Updated Alternative 2's Estimated Total Stumpage Value as $443,276.21 and Estimated Complete Road Costs as $2,149,001.97). If anything, vacating the SOP will save American taxpayers money.[2]

Unlike in the present case, there was a threat of serious disruptive economic consequences in *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 2021 U.S. Dist. LEXIS 43020 (S.D. Ohio Mar. 8, 2021). In that case, which involved already-issued oil and gas leases, defendant-intervenors alleged that they had investments in the project in the tens-of-millions of

---

[2] And, if implemented unsuccessfully, failed oak regeneration cuts would likely transition the cut areas to other, less economically (and ecologically) valuable hardwood species. This, in turn, would likely seriously degrade the future economic timber value of those areas.

dollars. Id. at *9-10. Likewise, lease payments had already issued to BLM and passed through to the state for local distribution – vacatur could therefore have resulted in substantial economic losses to federal, state, and local governments if the leases were required to be refunded. *Id.* at *10. Nothing remotely comparable holds here.[3] *Cf. also Nat'l Parks Conservation Ass'n v. Semonite*, 422 F. Supp. 3d 92, 101-103 (D.D.C. 2019) (finding disruptive threats of vacatur "very serious" given threat of rolling blackouts for hundreds of thousands of people, tens-of-millions of dollars required to remove powerline, and tens-of-millions of dollars to rebuild powerline).

Vacatur of the SOP will not result in serious disruptive consequences or harms that seriously outweigh the magnitude of the agency's errors. To the contrary, leaving the SOP in place would threaten more potential environmental and economic harm than vacating it would. And, the SOP's deficiencies are serious – they are sourced from the very centerpiece of the Project. Deficiencies that infect a project this deeply and thoroughly are not likely to be readily fixed through an agency explanation. Moreover, the Court has already found the SOP's potential effects to be highly uncertain and has granted Plaintiff's claim that the SOP requires an EIS. The EIS process is the appropriate space for resolving this Project's deficiencies. The Court should therefore order the standard remedy of vacatur.

### III. If the Court Decides Against the Standard Remedy of Vacatur, then It Should Enjoin the Sunny Oaks Project.

Vacatur and remand with instruction to complete an EIS for the SOP is the appropriate remedy here. Nonetheless, if the Court denies vacatur it should enjoin the SOP as a whole, including all activities under the SOP, until the Project's NEPA violations are remedied. This includes the minority of Project hardwood stands designated for clearcutting and for two-aged

---

[3] Though, certainly, if Forest Service has entered into contracts implementing SOP and wishes to claim disruption on that basis – it should disclose those contracts and their terms for the Court's and Plaintiff's review.

"clearcut with reserves."[4] This also includes the fire, bulldozing, thinning, and herbicide ("TSI")

treatments authorized by the SOP.[5]

Under well-established principles of equity, a plaintiff seeking permanent injunctive

relief must satisfy a four-factor test by showing:

> (1) that it has suffered (or is likely to suffer) an irreparable injury;
> (2) that remedies available at law, such as monetary damages, are inadequate to
> compensate for that injury;
> (3) that, considering the balance of hardships between the plaintiff and defendant,
> a remedy in equity is warranted; and
> (4) that the public interest would not be disserved by a permanent injunction.

*Cottonwood Env'tl Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1088 (9th Cir. 2015). Plaintiff

readily satisfies the four-factor test for permanent injunctive relief.

### A. Plaintiff and Plaintiff's Members are likely to suffer irreparable harms in the absence of an injunction.

Defendants' violation of NEPA has caused Plaintiff and its Members irreparable

procedural harm. And Plaintiff, through its member declarations, has readily demonstrated that

its Members have concrete interests in using specific areas of the Wayne National Forest in the

SOP project area (as well as their own properties either in or very near the project area), and that

these interests will likely be irreparably harmed by the Project's activities that will degrade,

impair, and materially alter the condition and quality of these areas for many decades. *See* Decl.

---

[4] Though these stands are not included in the SOP's "adaptive approach," the oak prescriptions at issue (two-aged) and the decision to forego oak mitigating treatments (clearcuts) also lack ascertainable, quantifiable criteria. For example, stands were chosen for "two aged" cuts because they were "the best." And stands were chosen for straight clearcutting because they would "require too heavy of an investment" to meet oak objectives. Final EA, Purpose and Need Slides, AR 13572 ("In Alternative 2 there are no strict clearcuts for stands that have an oak objective. Those oak stands *the best* oak stands are instead proposed to have a clearcut with reserved [sic] harvest that results in a two aged stand[.]") (emphasis added); *Id*. at AR 13573 ("For stands that would require *too heavy of an investment* to push towards oak in the future, a clearcut is proposed[.]") (emphasis added).
[5] In addition to causing irreparable harms to Plaintiff and Plaintiff's members, these activities are intertwined with the SOP's invalid shelterwood adaptive approach. The FDN-FONSI describes the TSI activities as part of the SOP's adaptive approach to shelterwoods: "TSI followed by a clearcut with reserves, resulting in a two-aged stand. This sequence would include an initial non-commercial TSI treatment (prescribed fire, manual tree feeling, and herbicide application, as described in the EA)"; "Three-staged shelterwood harvest. This sequence would include a preparatory harvest (lighter basal area removal)" – presumably a "TSI" thinning harvest. AR 13466 (FDN-FONSI).

of Brian Blair (ECF 18 "Exhibit 1"); Decl. of Dr. Laurel Kirkhart (ECF 18 "Ex. 2"); Decl. of Dave Ackerman ("Exhibit 3"). The irreparable harms the SOP's implementation is likely to cause Plaintiff's Members are explained in extensive detail in the aforementioned declarations.

It is well-established that both logging and prescribed burning in national forest parcels used by plaintiffs constitute irreparable harm to their interests. *See, e.g., All. for the Wild Rockies v. Pierson*, 550 F. Supp. 3d 894, 905 (D. Idaho 2021) (enjoining "logging, burning, road and trail construction" that would harm plaintiffs' "ability to view, experience, and utilize the areas in an undisturbed state," their "interests in the naturally functioning ecosystems of the Forest and the Project area," and "their interests in looking for, viewing, studying, and enjoying . . . wildlife species undisturbed in their natural surroundings"); *Native Ecosystems Council v. Mehlhoff*, No. 20-cv-19, 2020 WL 3969343, at *5-6 (D. Mont. July 6, 2020) (enjoining prescribed burns where they would cause "the destruction of specific wildlife habitat in that area" regularly used by the plaintiffs to view wildlife); *Habitat Educ. Ctr. v. Bosworth*, 381 F. Supp. 2d 842, 863 (E.D. Wis. 2005) (finding irreparable harm where "the Forest Service plans to harvest within or near goshawk, red-shouldered hawk, and marten habitat and that some of this harvesting will negatively affect such habitat and the species"); *Buckeye Forest Council v. U.S. Forest Serv.*, 337 F. Supp. 2d 1030, 1039 (S.D. Ohio 2004) (enjoining "tree cutting, thinning, logging, and prescribed burning" so the court was not "powerless to further examine the merits of Plaintiffs' claims because the trees will have already been cut down"). These are the same types of detailed injuries Plaintiff alleges here with respect to the specific parcels in which the Forest Service (or its contractors) will log, burn, apply herbicides, build roads, and bulldoze fire lines absent an injunction. The likelihood of irreparable harm in the absence of an injunction is well-established in this case.

**B. Remedies available at law are inadequate to compensate for the likely injuries.**

"Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987). This is especially true in NEPA cases because "the lack of an adequate environmental consideration [under NEPA] looms as a serious, immediate, and irreparable injury." *Found. on Econ. Trends v. Heckler*, 756 F.2d 143, 157 (D.C. Cir. 1985). "[T]he risk implied by a violation of NEPA is that real environmental harm will occur through inadequate foresight and deliberation"; "[t]he difficulty of stopping a bureaucratic steam roller, once started, [] seems to us, . . . a perfectly proper factor for a district court to take into account in assessing that risk, on a motion for a preliminary injunction." *Sierra Club v. Marsh*, 872 F.2d 497, 504 (1st Cir. 1989) (Breyer, J.); *see also W. Watersheds Proj. v. Zinke*, 336 F. Supp. 2d 1204, 1240 (D. Idaho 2018) ("Federal courts elsewhere have held, sensibly in this Court's view, that 'bureaucratic momentum' can support an argument of irreparable harm.").

**C. The balance of the equities and the public interest tip sharply in favor of injunctive relief.**

When an environmental injury is alleged, "the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987). This is certainly true in this case, for several reasons.

Granting a permanent injunction (pending completion of an EIS) also serves several important public interest objectives. First, it would preserve natural resources for present enjoyment. *See All. for the Wild Rockies v. Wood*, No. 07-cv-452, 2008 WL 2152237, at *2 (D. Idaho May 21, 2008) ("[T]he public's interest in preserving precious, unreplenishable resources must be taken into account in balancing the hardships."); *Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305, 326-27 (D.C. Cir. 1987) (affirming district court's finding that an injunction was in the

public interest to "protect against further illegal action pending resolution of the merits" and to "protect[] the environment from any threat of permanent damage"). Second, especially where environmental laws are at stake, there is a "strong public interest in meticulous compliance with the law by public officials." *Fund for Animals v. Espy*, 814 F. Supp. 142, 152 (D.D.C. 1993); *see also Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 26 (D.D.C. 2009) ("There is no question that the public has an interest in having Congress' mandates in NEPA carried out accurately and completely."); *Habitat Educ. Ctr., Inc. v. Bosworth*, 381 F. Supp. 2d 842, 864 (E.D. Wis. 2005) ("[I]t is not even arguable that violations by federal agencies of NEPA's provisions as established by Congress harm the public as well as the environment."); *Siskiyou Regional Educ. Proj. v. Goodman*, No. 04-cv-3058, 2004 WL 1737738, at *13 (D. Or. Aug. 3, 2004) (enjoining logging and finding that "the public interest is not served if the project goes forward in violation of" environmental laws).

Accordingly, should the Court decline the standard remedy of vacatur, the equities and public interest counsel strongly in favor of a permanent injunction pending completion of an EIS.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court vacate and set aside the Decision Notice, FONSI, and the Final EA held invalid by this Court, and remand the matter to the Forest Service for further environmental review consistent with NEPA, the APA, and the Court's Order granting Plaintiff's motion for summary judgment on its NEPA claim. On remand, the Forest Service should be directed to prepare an Environmental Impact Statement prior to taking any further actions or authorizations, including entering into any new contractual agreements, that would implement the SOP.

In the event the Court withholds vacatur, Plaintiff asks that the Court enjoin the SOP pending completion of an EIS and retain jurisdiction over the matter.

Plaintiff also intends to seek costs and attorney fees in this matter at the appropriate juncture.

Respectfully Submitted,

*/s/   Nathan G. Johnson*
Nathan G. Johnson (OH State Bar No.0082838)
*Trial Attorney for Ohio Environmental Council*
OHIO ENVIRONMENTAL COUNCIL
1145 Chesapeake Ave., Suite I
Columbus, OH 43212
Tel: (614) 487-5841
NJohnson@theOEC.org

## <u>CERTIFICATE OF SERVICE</u>

I certify under penalty of perjury that, on April 20, 2023, I filed a copy of the foregoing supplemental brief on behalf of Plaintiff Ohio Environmental Council via the CM/ECF system which will provide electronic service to all counsel of record.

DATED: April 20, 2023

> */s/  Nathan G. Johnson*
> Nathan G. Johnson
> (OH State Bar No.0082838)
> *Trial Attorney for Ohio Environmental Council*
> OHIO ENVIRONMENTAL COUNCIL
> 1145 Chesapeake Ave., Suite I
> Columbus, OH 43212
> Tel: (614) 487-5841
> NJohnson@theOEC.org